THE INDIANA NATIONAL BANK *v.* SAMUEL COLGATE AND CHARLES C. COLGATE.

Where a party orders goods to be shipped to him, and directs the vendor to draw upon him at sight, and attach the bill of lading to the draft, this direction is evidence that the title in the goods is not to pass to the purchaser until the the draft is paid.

When goods are shipped or afloat the bill of lading represents them, and the indorsement and delivery of it has exactly the same effect as the delivery of the goods themselves, when the intention is to transfer thereby the title to the goods or to pledge them by way of security for advances made or otherwise.*

The owners of goods at Indianapolis, having forwarded them to New York, consigned to defendants, who were their factors, for sale, made a draft on defendants on account of the goods, and before delivery of the goods to defendants, induced plaintiff to discount the draft by indorsing and delivering to it the bill of lading; *Held,* That this operated as a valid pledge of the goods to plaintiff, and upon the failure of the defendants to pay the draft, plaintiff was entitled to demand of them the goods, or in case they had sold them, to maintain an action for the proceeds of the sale as money received to plaintiff's use.

APPEAL by defendants from a judgment of this court entered on the report of a referee.

---

* See, to the same effect, *Marine Bank* v. *Wright,* 48 N. Y. 1.

This was an action by the plaintiffs against the defendants, who were doing business in New York city, under the firm name of Colgate & Co., to recover the amount of a draft for $6,000, drawn on the defendants, with five per cent. damages, according to the laws of Indiana. The draft had been drawn by H. W. Comstock, of Indianapolis, against the proceeds of 200 tierces of lard consigned to defendants by Culton & Sprague, of Chicago, for account of H. W. Comstock, and had been given to plaintiffs with the bill of lading of the lard attached by way of security.

The defense was that the 200 tierces of lard in question had been consigned to defendants as part of a lot of 500 tierces agreed to be consigned to them by the firm of H. W. Comstock & Co., as security for advances made and to be made, and in consideration of the acceptance by the defendants, of H. W. Comstock & Co.'s draft for $3,500, and that when the draft for $6,000 was presented to them, they had not sufficient funds in their hands belonging to H. W. Comstock & Co., to pay the same.

The case was referred to a referee, who found, as matters of fact, that on August 17th, 1867, the firm of Culton & Sprague, of Chicago, Ill., shipped 200 tierces of lard consigned to defendants at New York city, for account of H. W. Comstock, and took a bill of lading therefor. On August 24th, 1867, H. W. Comstock, at Indianapolis, made a sight draft on Colgate & Co. for $6,000, and said draft, indorsed by H. W. Comstock & Co., and with the bill of lading attached (the bill of lading had been obtained by H. W. Comstock & Co., by the means described in the opinion), was discounted by plaintiffs, who paid full value therefor.

The defendants were the factors, in New York, of H. W. Comstock & Co., and had made advances to them on goods consigned for sale.

About August 28th, 1867, the defendants came into possession of the 200 tierces of lard, and on the same day sold them for $8,327 59, which they collected on August 30th, following.

On August 29th, and again on the 30th, the draft for $6,000

was presented to defendants, who refused to pay it, and it was protested for non-payment.

The referee also found that defendants had not proved that H. W. Comstock & Co., at the time of presentation to them of the draft and bill of lading attached, were indebted to them in any sum whatever, for any advance therefor made by them to H. W. Comstock & Co. That the draft for $3,500, mentioned in the answer of the defendants, and accepted by them, had been fully paid to them by the proceeds of sale of other property consigned to them by the said H. W. Comstock & Co. That the defendants had not proved that the said 200 tierces of lard were conveyed to them upon any such agreement as was alleged by them. Upon these facts, the referee decided that the plaintiffs, by the delivery to them of the bill of lading, became the *bona fide* purchasers thereof, and acquired the legal title thereof and to the property mentioned therein, as security for the amount due them for the $6,000 draft, and that the defendants were liable for so much of the proceeds of the lard as was necessary to pay the draft with interest, and the five per cent. damages allowed by the laws of Indiana.

He gave judgment for the plaintiffs accordingly, and defendants appealed.

*Luther R. Marsh*, for appellants.

I. The lard, being consigned to the defendants, they were presumptively the owners, and entitled to the possession thereof (*Price* v. *Powell*, 3 N. Y. 322; .*Green* v. *Clarke*, 12 Id. 343; *Sweet* v. *Barney*, 23 Id. 335; *Grove* v. *O'Brien*, 8 How. U. S. 429).

II. The lard, being received and sold by defendants before any notice was given to them of defendants' draft, they are not liable (Story on Agency, § 376; *Harris* v. *Clark*, 3 N. Y. 93; *Copperthwaite* v. *Sheffield*, Id. 243; *Winter* v. *Drury*, 5 Id. 525).

The action should have been brought for the conversion of the lard, and not on the draft.

*John Sessions*, for respondents, relied on *Bank of Rochester* v. *Jones*, 4 N. Y. (4 Coms.) 497.

BY THE COURT.*—DALY, CHIEF JUSTICE.—The referee has found that the 200 tierces of lard in controversy were not shipped by Comstock & Co. to the defendants as parcel of a lot of five hundred tierces, the possession of which was to be transferred by them to the defendants in consideration of their having accepted and paid Comstock & Co.'s draft against the shipment of $3,500, and I see no ground upon the evidence that would warrant us in disturbing the finding.

The defendants, by their letter of August 17th, 1867, advised Comstock & Co. that they, the defendants, were anxious to clear up the old business and pay over the balance to Comstock & Co.'s agents here, but that until 550 tierces should arrive, they could not do so, as Comstock & Co.'s *shipments* did *not complete themselves* until then. Upon the 19th of August, Comstock & Co. wrote the defendants that they wanted a statement to enable them to settle with the railroad company, and to know whether to draw against 300 tierces shipped to the defendants, Friday, August 17th, and advise them of 200 tierces ordered for them from Cincinnati, that day, August 19th. The defendants claim that the 300 tierces referred to in this last letter include the two hundred in controversy, the whole being sent in two shipments on August 17th, 1867, and which, with the two hundred referred to in the letter, as ordered from Cincinnati, would make up 500 tierces.

The following day, August 20th, 1867, Comstock & Co. telegraphed the defendants that they had drawn that day upon them for $3,500 against a shipment of 500 tierces. On the 22d of August, 1867, the defendants answer that they inferred from the telegram, and that Comstock & Co.'s letter, in fact, stated, that they had shipped 500 tierces, and express their surprise to find the draft for $3,500 with a security of only 100 tierces shipped, attached to it, and they refer to the difficulty mentioned in Comstock & Co.'s letter of the 19th of August, 1867, between them and the railroad company, and to the fact that considerable uncertainty existed about the shipment of 300 tierces for which the company had issued bills of lading,

*Present, DALY, CH. J., and LOEW and J. F. DALY, JJ.

&c., and state that they have telegraphed for an explanation, which they await. They express the hope that Comstock & Co. will have no trouble with the party who sold them the lard, and which, they say, has apparently not been shipped. This draft, it would appear, they accepted; but they did so with a knowledge that there was a difficulty in respect to 300 tierces, and with the impression that they had not been shipped. They had then received a bill of lading for only 100 tierces; and that they had not made this advance upon any indicia that title to any greater amount would or did by that acceptance pass to them, appears from the fact, that they did not know that any greater amount had been shipped to them, which is shown by what has been already stated, and the further observation in their letter, that the railroad company would " bring themselves into a very troublesome position by signing bills of lading before they assume control of the stock purported to be shipped," and that their bills of lading had been used by Comstock & Co. in drawing upon the defendants. The defendants anticipated that a shipment would be made to them of 500 tierces, and when the telegram referred to was received, and they may have thought that that quantity was actually shipped; but Comstock & Co.'s letter of August 19th, 1867, advised them that there was a difficulty. It was in part in these words: " We are in an unpleasant fix with the railroad company about our shipments of lard, and only the statement of receipts by you asked for in ours of some days since, will enable us to set the matter right. We have bought and claim to have delivered to the company about 300 tierces more lard than they are willing to acknowledge having received. One thing is absolutely certain, we have had their B. of L. (Bill of Lading), and *have used it* in drawing upon you, and if R. R. Co. have not received the lard you have not, and we have a fair prospect of 'muss' with the seller, and while you have advanced on lard that has not been forwarded. We want your statement for two grand reasons: one is to enable us to settle with the R. R. Co., and the other that we may know whether to draw anything against 300 tierces lard shipped you from Chicago last Friday (August 17, 1867), and 200 ordered to you from Cin. to-day. If you have not sent

the statement asked for, you will see that it is important that we should have it, and as soon as possible."

The defendants had sent the statement the day of the date of this last letter, and the 34th item in it was an acknowledgment of 300 tierces to Comstock & Co., and it was dated the 19th of August, 1867, and the arrival of which was under the head of August 17th.

This letter of August 17th advised the defendants that Comstock & Co. had used the bill of lading in drawing upon them, the plain purport of which obviously is that they had used it to get the draft drawn upon them discounted, and that there was a difficulty with the railroad company, who, though they had given the bill of lading, were not willing to acknowledge that they had received the full amount which it covered, and hence the defendants' surprise when they received the draft with only a bill of lading attached to it for 100 tierces. They asked, as I have said, for an explanation, and the reply by telegram was in these words: "At time draft was made, had no other bill. Two hundred more shipped next day; we send you that bill." And in a letter which followed on the 22d of August, 1867, they informed the defendants that they had so much invested in margins of property of that kind, that it was inconvenient for them to pay for the last 500 tierces, then on their way to the defendants, costing about $18,000, without realizing all that they could, consistently, out of it.

The letter of Comstock & Co. of the 19th of August, 1867, was untrue. The difficulty was not with the railroad company, nor with the sellers, but with Comstock & Co. themselves. The evidence discloses this state of facts. Comstock & Co., who were residents at Indianapolis, telegraphed Culton & Sprague, commission merchants in Chicago, to purchase in Chicago, on account of Comstock & Co., the lard in controversy, to ship it to New York, consigned to Colgate & Co., the defendants, and to draw on Comstock & Co., at Indianapolis, for the amount, at sight, with the bill of lading of the lard attached to the draft. Culton & Sprague did as requested, and on the 17th of August, 1867, shipped by the railroad 200 tierces, consigned to the defendants, and took from the railroad company the original bill

of lading and duplicate, which acknowledged that the 200 tierces had been received from Culton & Sprague, to be transported, as consigned, to the defendants, and on the 19th of August, 1867, Culton & Sprague drew a draft for the amount of the purchase and their commissions upon Comstock & Co., at sight, and attached to it the bill of lading for the 200 tierces, retaining the duplicate, which draft, with the original bill of lading, they sent through a bank at Chicago to the Indiana Banking Company, at Indianapolis, for collection, with instructions that if it was not paid, to return the draft and bill of lading to them. Culton & Sprague had no personal acquaintance with the house of Comstock & Co., and relied for the security for their advances upon the lard shipped. The draft was dated on the 19th of August, 1867. It was received by the Indiana Banking Company on the 21st of August following, and was presented upon that day to Comstock & Co., but was not paid upon presentation, as that firm claimed three days' grace, which was allowed by the Indiana Banking Company, and Comstock & Co. accepted the draft. In the meanwhile, Culton & Sprague, having received information from sources which they considered reliable in Indianapolis, which led them to doubt the pecuniary ability, stability and standing of Comstock & Co., and fearing that they were in great danger of losing the advances they had made upon the lard, went to the railroad company on the day prior to the last day of grace and stopped the lard in transitu; that is, they requested the railroad company to stop and hold it, until the draft was paid. Up to this point, there can be no question that the general ownership was in Culton & Sprague, as they retained both the bill of lading and duplicate, awaiting the payment of the draft, and the lard, though shipped and consigned to the defendants in New York, was then held by the railroad company, subject to the order of the shippers. The direction given by Comstock & Co., that the bill of lading was to be attached to the draft to be drawn upon them at sight, shows that it was alike their understanding, as well as that of Culton & Sprague, that the title to the shipment was not to pass, unless the draft was paid (*Brant* v. *Bowley*, 2 B. & Ad. 932; *Ogle*

v. *Atkinson*, 5 Taunt; 759; *Fleeman* v. *McKean*, 25 Barb. 483; *Furniss* v. *Hone*, 8 Wend. 247).

The draft and bill of lading remained in the possession of the Indiana Banking Company until the last day of grace, the 24th of August, 1867, when H. W. Comstock, one of the firm of Comstock & Co., was allowed by the president of the Banking Company to take the bill of lading to obtain from the plaintiffs, the Indiana National Bank, by means of it, the money wherewith to pay the draft, which he did, and returned with a certified check on that bank for $5,985, and paid the draft, which was for $7,700$\frac{47}{100}$, the Banking Company giving him credit for the amount of the certified check on the plaintiffs' bank, the residue being made up of money which Comstock & Co. had on deposit in the Banking Company; and Culton & Sprague, having advices the next day, that the draft was paid, they directed the railroad company to forward the 200 tierces, which were received by the defendants on the 28th of August, 1867, and they were sold by them upon the day they were received.

It appears that the plaintiff, the Indiana National Bank, let Comstock & Co. have the $5,985 upon a draft drawn by H. W. Comstock on the drafts for $6,000, indorsed by Comstock & Co., secured by an indorsement of the bill of lading and the delivery of it to the plaintiff as security. This draft, dated the 24th of August, 1867, with the bill of lading attached, was presented to the defendants for payment on the 29th of August, 1867, which was refused, and on the following day they were requested to pay the draft or deliver the goods, and replied that they had sold them and could not therefore deliver them.

No title to these 200 tierces, as I have said, was or could be acquired by Comstock & Co. until the draft of Culton & Sprague was paid. Up to that time neither they nor the consignees, the defendants, could acquire any property in the lard, and whatever interest Comstock & Co. had or could acquire was by them immediately transferred to the bank, to enable them to do the very act, the payment of the draft, by which alone they could obtain any right to the lard. When the goods are shipped or afloat, the bill of lading represents them, and the indorsement

and delivery of it has exactly the same effect as the delivery of the goods themselves, where the intention is to transfer thereby the title to the goods or to pledge them by way of security for advances or otherwise (*Newson* v. *Thornton*, 6 East, 41; *Short* v. *Simpson*, Eng. Law Rep. 1 C. P. 248; *Meyerstein* v. *Barber*, Id. 2 C. P. 45). Such was the case here. Comstock & Co. procured an advance from the plaintiffs upon the security of the bill of lading, to enable them to pay for the lard, and but for which payment it would never have been forwarded at all. The indorsement and delivery of the bill of lading operated as a valid pledge of the lard to the bank, and entitled the bank to demand it of the consignees, the defendants, and the defendants having sold it immediately upon the day of its arrival, the plaintiffs could maintain an action for the proceeds of the sale, as money received to its use. In *Meyerstein* v. *Barber* (*supra*), a lot of cotton was shipped from Madras to a London house, the consignor in Madras drawing bills against the shipment upon the London house, which the consignor had discounted at a bank, to whom he delivered the bill of lading, the cotton being deliverable in London to the shipper or his assignee on payment of freight. The cotton arrived, was landed and warehoused, and one Abraham, who had succeeded to the business of the London house, applied to the plaintiff, Meyerstein, for an advance of £2,500, to enable him to discharge the lien of the bank and to obtain the bill of lading. The bank entrusted Abraham with the bill of lading to enable him to get the means of satisfying their claim, and the plaintiff made the advance upon the bill of lading, which was in three parts, upon the delivery of two copies, supposing that the other was in the possession of the master and that the vessel had not arrived. The claim of the bank having been satisfied, and an indorsement of the bill of lading having been obtained from the shipper, Abraham, who fraudulently retained the third copy in his possession, took it and the invoice of the cotton to the defendant and obtained an advance of £2,000. The plaintiff hearing that the cotton had arrived, and that the defendant had it for sale as a broker, went to the defendant, informed him of the advance which he had made and showed the two copies of

the bill of lading; after which interview, but pursuant to pre-vious instruction, the defendant's clerk went to the public ware-house, had the cotton transferred to the defendant, obtained a warrant for the delivery of it, and the defendant sold it. It was held that the plaintiff might either maintain an action against the defendant for the conversion of the property, or for the proceeds of the sale, as money received to his use, and I refer to this case the more particularly because several of the propositions passed upon in it may be referred to as an answer to objections raised by the defendants to the plaintiff's right of recovery in the present case.

They were as follows: 1. That the deposit of the bill of lading with the bank in India, upon discounting the bills of ex-change, operated as a pledge of the cotton to the bank, so that the bank or its representative in London had a perfect right to indemnify themselves out of the proceeds of the cotton, upon its arrival, for the advances made. 2. That the three copies con-stituted but one bill of lading. 3. That the property in the cotton was in the shipper, at Madras, subject to the claim of the bank. 4. That before its arrival, the property in it vested in Abraham, who had succeeded to the business of the London house, by whom the contract was made for the purchase and shipment of it. 5. That he was entitled, claiming to be the owner, to make the usual entry at the custom house, but could not obtain it from the public warehouse upon his delivery order, without producing the bill of lading. 6. That the bill of lading was the symbol of the property in the cotton, and when Abraham delivered that to Meyerstein, the plaintiff, the property passed to the plaintiff just as if the cotton had been actually delivered to him. 7. That the delivery by him of two of the three parts of the bill of lading sufficed to vest the prop-erty, and was not affected by the delivery afterwards of the cotton to the defendant upon the third part or copy of the bill of lading. 8. That the plaintiff's right of action was founded simply upon the delivery of the two parts of the bill of lading to him by Abraham, and the advance of the £2,500 he made thereon. 9. That it was a valid pledge to him of the cot-ton, and that he might recover either for a conversion or re-

cover the proceeds of the sale under the count for money received.

Though it does not appear in the evidence, it is probably the fact that Culton & Sprague, when they directed the railroad company to forward the 200 tierces upon learning that the draft was paid, sent the duplicate of the bill of lading, which they had retained, to the defendants, to entitle them to receive the shipment upon its arrival in New York, a feature analogous to that of the defendant in the case cited, who, having one of the copies of the bill of lading, obtained thereby a delivery of the cotton to him from the public warehouse, and which was held not to affect in any way the right to the cotton which the plaintiff had acquired by the advance of the £2,500, and the delivery, before that, of the other two copies to him.

The decision of the Court of Appeals of our own State in *The Bank of Rochester* v. *Jones* (4 N. Y. 497), is equally decisive. There the bank advanced the money to the purchaser of the flour to enable him to buy it; and having refused to make the advance without security, the purchaser agreed to procure the forwarder's receipt for the flour to be purchased with the money received from the bank, and to leave it with the bank as a security for the acceptance of the draft, to be drawn upon the defendant, who was the consignee, which the purchaser accordingly did. The bank forwarded the draft, with the receipt annexed, to the collecting agent. The defendant refused to accept the draft, but took off the forwarder's receipt, got the flour and sold it. The defendant was the purchaser's factor in Albany for the sale of flour for him, and the purchaser was then in debt to the defendant for advances made, so that the case was even stronger in favor of the defendant than the one now before us, for this indebtedness existed at the time of the consignment. The action was *trover*, and it was held, reversing the decision of the Supreme Court, that the plaintiff could maintain it.

It was held, 1. That the purchaser was the general owner. 2. That there was no obligation on his part to send all his flour to the defendant, to reimburse him for the advances made. 3. That, being the absolute owner, the purchaser had full power

and authority to sell, pledge, or dispose of the flour to the bank before it came into the defendant's possession. 4. That the transfer to the bank was good as against his agents, factors, or creditors, and all persons except *bona fide* purchasers for a valuable consideration, without notice, &c. 5. That the transaction with the bank and the delivery to it of the forwarder's receipt, gave the bank a general or a special property in the flour, which was equivalent to a pledge or a mortgage of it. 6. That the delivery of the forwarder's receipt to the bank was a symbolical delivery of the flour, either in trust, by way of mortgage, or as a pledge; and all that was here decided is applicable to the present case.

The plaintiffs acquired the title to the 200 tierces, without any knowledge of any claim to them by the defendant, the consignee or any other person, and had no reason to suppose that there could be any claim to affect the title they acquired by the delivery to them of the bill of lading, as they advanced the money to Comstock & Co., to enable the latter to obtain title, and made the advance upon what represented the property, and was the symbol and indicia of title, the bill of lading, which they took as their security.

My conclusions are, that the defendants did not make any advance upon this specific shipment. That they had no property in it except such as they might acquire as consignees, subject to the right, title and interest which the bank had acquired by the advance made and the delivery of the bill of lading to it, before the property came into the possession of the defendants. That, having sold the lard, they must account to the plaintiffs for the proceeds; and as the proceeds or value of the lard was much more than the amount of the draft, that the plaintiffs were entitled to recover the amount of the draft and damages upon the protest. The report of the referee should, therefore, be affirmed.

Judgment affirmed.