4  497<br>108  250<br><br>4  497<br>149  96

## The Bank of Rochester *vs.* Jones.

Where property is delivered to a forwarder or carrier, upon consignment to a factor for sale, but the receipt or bill of lading is not delivered or sent by the owner to the factor, and the property has not reached him, the factor acquires by the transaction no general or special property in the goods.

And this is so, although the consignor is indebted to the factor for advances upon previous consignments, to an amount greater than the value of the goods.

The consignor in such a case, if he be the general owner, may, after the consignment and before the property has reached the consignee, transfer the title to the goods to a third person, by an assignment of the bill of lading, or even by a delivery thereof with intent to pass the title.

A factor can only claim a lien on goods in his possession, and such possession must be lawful, and not obtained by an illegal act or in bad faith.

A. the owner of 200 barrels of flour, delivered the same to a forwarder at Rochester, and took a receipt expressing that the flour was to be sent to the defendant at Albany; the defendant being the factor to whom A. usually consigned flour for sale, and A. being indebted to him for advances on previous consignments. A. on the same day drew upon the defendant against the flour and procured the plaintiff's bank at Rochester to discount the draft, on delivering to the bank the forwarder's receipt and agreeing that the bank might hold it as security *for the acceptance* of the draft. The defendant refused to accept the draft, but subsequently received the flour and converted it to his own use, having notice of the transaction with the plaintiff's bank. *Held*, that the defendant was liable to the plaintiffs in trover for the flour.

The defendant, the factor, acquired by the consignment no right to the flour, except

on condition of accepting the draft, and having refused acceptance, he became a wrongdoer by taking and converting the flour.

The discount of the draft by the plaintiffs, and the delivery to them by the consignor of the forwarder's receipt, amounted, it seems, to a sale of the flour to the plaintiffs in trust to deliver it to the defendant in case he accepted the draft, or in case he refused to accept, then in trust to sell the flour and pay the draft.

[498] It seems also, that the transaction with the bank might be sustained as a mort gage of the flour.

A mortgage of goods may be valid between the parties without writing. A personal mortgage must be filed, and consequently in writing only where the rights of creditors and purchasers in good faith are concerned. Per PAIGE, J.

In cases of mortgage of goods, the general property vests in the mortgagee subject to a defeasance by performance of the condition.

THIS was an action of trover, commenced by the Bank of Rochester against Jones for 200 barrels of flour. The cause was tried at the Albany circuit in Sept. 1847, before Justice WILLARD, who nonsuited the plaintiff in accordance with the opinion of the supreme court, previously given in the cause. (See 4 Denio, 489.) The case was this: In July, 1843, W. C. Foster applied to the cashier of the bank to borrow nine hundred and fifty dollars, for the purpose of buying of W. Ely 200 barrels of flour. The cashier refused to make the loan without security. Foster proposed to procure the forwarder's receipt for the 200 barrels of flour to be purchased with the money received from the bank on the loan, and to leave such receipt with the bank as security for the acceptance of a draft to be drawn on the defendant. This proposition was accepted by the bank. Foster delivered the draft and forwarder's receipt to the cashier, and the bank discounted the draft. The bank forwarded the draft with the receipt pinned to it, to their collecting agent at Albany, to be presented to the defendant for acceptance. The draft, with the receipt annexed, was presented to the defendant for acceptance by the agent of the bank. Jones took off the receipt and retained it, and refused to accept the draft. Afterwards the receipt was demanded of Jones by the agent of the bank and returned by him. Jones sent his clerk to Utica, who there met the flour, and sold it at that place, on the 20th of July, 1843, the market then being falling. The draft drawn by Foster on Jones was dated July 15th, 1843, for $950. The receipt bore

the same date, and was in the following words, viz.: " Rec'd, Rochester, July 15th, 1843, of W. C. Foster, 200 barrels of flour to be forwarded to B. P. Jones, Albany, in good order, without delay, subject to 45 cents freight.          R. D. HANNAH.

M. K. E. D. Ely.          200 barrels."

The agreement between Foster and the bank at the time [499] the draft was discounted, was that the flour was to be held by the bank as security that the draft would be accepted by Jones; if not so accepted, the bank was to have the right to hold the flour and to sell it. If Jones accepted the draft, he was to take the receipt as his security, and the bank was to look to him alone. Ely, from whom the flour was purchased, received, with Foster's assent, from the bank the proceeds of the draft. At the time of the consignment, Jones was the factor of Foster to sell flour for him at Albany. Foster at the time of the consignment was in debt to Jones for advances on previous acceptances, on account of flour, from $400 to $1000. The flour was delivered to Hannah before the draft was discounted, or Foster had obtained his receipt, but on the same day. Foster at the time of the consignment was the absolute owner of the flour. It was optional with him to send more or less of his flour to Jones. There was no contract between him and Jones which prevented him from selling the flour in question at Rochester. Before the commencement of the suit, the flour was demanded of Jones by the bank. There was no evidence that any bill of lading or invoice had been sent, or delivered to Jones by Foster.

The supreme court having refused to set aside the nonsuit granted by Judge WILLARD, the plaintiff appealed to this court.

*M. T. Reynolds*, for appellant.

*A. Taber*, for respondent.

PAIGE, J. If the Bank of Rochester had filed a bill in equity for relief, it is quite clear that the bank would have been entitled to a decree declaring their demand against Foster for the moneys advanced on his draft on Jones, an equitable lien on the flour.

The bank was entitled to the rights of a *bona fide* purchaser for a valuable consideration, without notice of any prior legal or equitable claim to the property. Having advanced their money on the faith of and at the time of the making of the agreement, [500] that the flour should be held as security for the acceptance, or payment of the draft, their equitable claim to a lien on the flour was both superior and prior to that of Jones for his pre-existing demand for the balance of his general account against Foster. But this action was brought at law, and we are to determine whether upon legal principles it can be sustained.

It is very evident that Jones had neither a general, or special property in the flour. If the forwarder's receipt, which may be regarded as a bill of lading, had been delivered to him by Foster, he would then have acquired either a general or special property in the flour. But as such receipt or bill of lading was neither sent or delivered to him by Foster, he acquired no title to the property, nor any right to receive and sell the same. There was no agreement existing between Foster and Jones which obligated the former to send all his flour to the latter, to be sold by him, for the reimbursement of his advances made on the credit of flour to be consigned to him by Foster. Foster, when the flour in question was consigned, was the absolute owner thereof, and had full power to sell and dispose of it, either at Rochester, or at any other place, before it lawfully came into the possession of Jones. The mere taking of the forwarder's receipt by Foster from Hannah transferred no title to Jones. The nature and operation of a bill of lading is accurately described by Lord Denman in *Mitchell* v. *Ede*, (11 *Adol. & Ellis*, 888.) He says, " As between the owner and shipper of the goods and the captain, it fixes and determines the duty of the latter as to the person, to whom it is (at the time) the pleasure of the former, that the goods should be delivered. But there is nothing final or irrevocable in its nature. The owner of the goods may change his purpose at any rate before the delivery of the goods themselves, or of the bill of lading to the party named in it, and may order the delivery to be to some other person, to B. instead of to A." A simple consignment of goods unexplained, by the well settled rule

of commercial law, only shows that the consignee is thereby constituted the authorized agent of the owner whoever he may be, to receive and sell the goods and account for the proceeds. (*Conard* v. *The Atlantic Ins. Co.* 1 *Peters*, 444 ; 7 *Cowen*, [501] 328 ; 2 *Hill*, 151, 2.) A bill of lading can always be explained by parol. It may be shown by parol to have been intended as evidence of an absolute sale, a trust, a mortgage, a pledge, a lien, or a mere agency. (*Grosvenor* v. *Philips*, 2 *Hill*, 151, 2, per *Cowen*, *J.*; 1 *Durn. & East*, 745, 6, *and note*.) The consignor, if he is the general owner, may, after the consignment, by any assignment either of the bill of lading, or by a separate instrument, pass the legal title to the goods, and the transfer will be good as against his agents and factors, and creditors, and all persons except *bona fide* purchasers for a valuable consideration, without notice of any adverse interest, from the consignee, by an indorsement of the bill of lading, or of the goods after they came lawfully into the possession of the consignee. (1 *Peters*, 444, 5, per *Story*, *J.*) A factor can only claim a lien on property in his possession. He has no lien on goods of which he acquired possession by an illegal act, or in bad faith. (*Dunlap's Paley on Agency*, *p.* 137, *and notes M. & P.* 130 ; 8 *Taunton*, 68 ; *Kinlock* v. *Craig*, 3 *T. R.* 119.) Where the bill of lading has not been delivered to the consignee and there is no other evidence of an intention, on the part of the consignor, to consign the specific property to him, no lien will attach. (*Russ. on Fac. & Brs.* 204 ; *Mitchell* v. *Ede*, 11 *Adol. & Ellis*, 888.)

As no bill of lading of the flour in question was delivered to Jones, and as there is no other evidence of an intention to consign the flour to him, otherwise than upon the condition of accepting the draft, he acquired no lien on the flour for the balance of his general account against Foster. His separation of the bill of lading from the draft, on the presentation of the latter to him for acceptance, was an illegal act ; and the bill of lading, thus illegally, if not fraudulently, obtained, passed to him no interest in the flour ; and gave him no authority to re ceive and sell it, and reimburse himself for previous advances,

out of the proceeds. The presentation of the draft to Jones for acceptance, with the bill of lading annexed, by the collecting agent of the bank, was notice to him of the interest of the latter in the flour. And he had no right to separate the bill of lading [502] from the draft and retain the former without accepting the latter. (*Barrow* v. *Soles*, 3 *Campb.* 92.) It was not possible for him under the circumstances of this case to acquire any property in the flour, except by a performance of the condition imposed, that of accepting the draft. By refusing to accept the draft, and illegally obtaining possession of the bill of lading, and receiving and selling the flour, he became a tort feasor.

Did the agreement entered into between Foster and the bank, have the effect of transferring to the latter either the general or a special property in the flour?

I think that by force of the agreement, entered into between Foster and the bank, in connection with the delivery to the bank of the carrier's receipt or bill of lading, and the advance by the bank of the money on Foster's draft on Jones, either the general or a special property in the flour passed to the bank. The true ground on which to sustain this transfer of property to the bank is, by regarding the transaction as a sale to the bank in trust, to deliver the property to Jones, in case he accepted the draft; and if he refused to accept the draft, then to sell the flour and to retain out of the proceeds the amount of the draft, and to pay the surplus to Foster. The transaction between Foster and the bank, may also, I think, be regarded as either a pledge or a mortgage of the flour. It will be recollected that Foster, at the making of the agreement, was the absolute owner of, and had the sole control and disposition thereof. He had in his possession the forwarder's receipt, and had not sent or delivered to Jones either a bill of lading or an invoice of the flour. Under these circumstances the forwarder or carrier was a mere bailee or servant of Foster; and has no right to withhold from him, as the general owner, the possession of the flour. And although Foster had parted with the actual possession, yet he continued to have the constructive or legal possession, and the right to immediate actual possession. (1 *Chit. Pl.* 152, *Springf.*

*ed.;* 2 *Saund.* 47, *a, note* 1 ; *Gordon* v. *Harper,* 7 *Durn. & East,* 12, 13 ; *Thorp* v. *Burling,* 11 *John.* 285.) Foster being the general owner, and having the possession in law, transferred the flour to the bank as a security for the acceptance of the [503] draft by Jones, or for its payment in case Jones refused to accept it. When he made this transfer he was in the possession of the property by his servant, the carrier. And as an evidence of the change of the possession, and of the delivery of the flour to the bank, he delivered to the latter the carrier's receipt, or bill of lading. The possession of the carrier's receipt, although not indorsed, or formally transferred, was evidence to the carrier that the bank was entitled to the possession of the flour. The bank, without the possession of the receipt, regarding the transaction as a sale, would have been vested with the legal title to the property. A sale by parol, of personal property, is valid, if not within the statute of frauds. The sale did not come within that statute, as the whole purchase money, being the money advanced on the draft, was paid at the time of the sale. If the sale was a valid sale, the actual delivery of possession was not necessary to the passing of the title. Title will pass without actual delivery, if the consideration is paid. The general property which was transferred drew after it, without any actual delivery, the possession of the goods. But the bank must be regarded as accepting and receiving the goods from Foster. (2 *R. S.* 136.) The delivery of the carrier's receipt to the bank, was a symbolical delivery of the flour. The case of *Haille* v. *Smith,* (1 *Bos. & Pul.* 563,) sustains the proposition that the transaction between these parties may be regarded as a sale in trust. In that case, G. & H. Brown, of Liverpool, wishing to draw upon L. Smith & Co. a banking house in London, to a large amount, agreed, among other securities to be given, to consign goods to a mercantile house consisting of the same partners as the banking house; and accordingly, G. & H. Brown remitted the invoice of a cargo, and the bill of lading indorsed in blank, to the mercantile house; but the cargo was prevented from leaving Liverpool by an embargo, and G. & H. Brown then became bankrupt, being considerably

indebted to L. Smith & Co. and the cargo was delivered to their assignees in bankruptcy by the captain. It was held that the goods consigned to the mercantile house, transferred to such house the general property in trust, in which the banking house [504] and the consignors were both concerned as cestuis que trust; and it was held that the bill of lading operated as an evidence of the change of property. Eyre, Ch. J. says: "From the moment, then, that the goods were set apart for this particular purpose, why should we not hold the property in them to have been changed, it being in perfect conformity to the agreement, and such an execution thereof as the justice of the case requires. I see no reason why we should not expound the doctrine of transfer very largely upon the agreement of the parties and upon their intent to carry the substance of that agreement into execution." In *Tooke* v. *Hollingworth*, (5 *Durnf. & East*, 215,) where Daniel, of London, agreed to purchase of Tooke, of Manchester, all the light gold coin which the latter should send to the former; and that Tooke should from time to time draw bills of exchange on Daniel, for the money due on such sale; and Daniel afterwards became bankrupt, being under acceptances for Tooke to a large amount: and Tooke not knowing of Daniel's bankruptcy, sent a parcel of light gold to Daniel, to enable him to discharge the acceptances, which parcel was taken by Daniel's assignees; it was held that Tooke, who afterwards paid Daniel's acceptances, might recover back the gold sent after the bankruptcy; on the ground that it was sent for a particular purpose, that of paying the acceptances; and that as that purpose was not answered, the property in the gold remained in Tooke. In that case, Ashurst, J. says: "Now it appears on the record that the goods were sent for the express purpose of paying the bankrupt's acceptances; and that purpose not having been answered, as it could not be, the plaintiff may retake the goods. On this ground, justice, honesty and law coincide." In the case under review, it was agreed by the parties before the flour was purchased of Ely, that the flour should be held by the bank as security for the money loaned to Foster; and that it should be forwarded and delivered to Jones, in case

he accepted the draft; and if he did not accept the draft, that it should be sold by the bank, and the draft paid out of the proceeds. The flour was forwarded for a particular purpose, to secure the bank for the moneys advanced to Foster. Law and justice coincide in requiring that the flour should be ap- [505] plied to the purpose for which it was forwarded, in accordance with the agreement of the parties, on the faith of which the money was advanced to Foster. In *Nathans* v. *Giles*, (5 *Taunt.* 588,) where a cargo of wheat arrived in London, belonging to Lewis, of Hamburgh, the master of the vessel had signed bills of lading for the delivery of the cargo to Lewis or order, or his assigns, or the bearer of the bills of lading. The bills of lading had not arrived in London when the wheat arrived. Josephs, the attorney of Lewis, gave Nathans a security on the wheat for advances made for Lewis. It was held that the cargo belonged to Nathans. That the property in a cargo for which the master of a ship has signed bills of lading, may be transferred by delivery, without indorsement of the bill of lading; and that the transfer will be good against all the world except subsequent indorsers of the bill of lading for a valuable consideration.

The case of *Allen* v. *Williams*, (12 *Pick.* 297,) has a direct application to this case. Thayer, of New-York, shipped a cargo of flour to Boston, and took two bills of lading showing that the flour was shipped by Thayer to be delivered to E. Williams & Co. or bearer. A third bill was retained by the master for his own use, and he had no authority to deliver it to E. Williams & Co. or to any other person. Thayer drew a bill of exchange on E. Williams & Co. and negotiated both the bill of exchange and the bills of lading to Allen for a valuable consideration. Thayer informed E. Williams & Co. that he had drawn on them against the shipment, and that he had negotiated the bill of exchange to Allen, and had delivered to him the bills of lading as his security. Allen presented the bill of exchange to E. Williams & Co. for acceptance and payment, and tendered to them the bills of lading upon condition they would honor the draft, which they refused to do; and afterwards the master delivered to E. Williams & Co. his bill of lading, and they re-

ceived the flour and sold it. Thayer was at the time indebted to E. Williams & Co. in a balance of account for previous acceptances on account of flour consigned to them by him. It [506] was held that the mere delivery of the bill of lading to Allen for value passed the property to him against any person except a previous assignee of the bill of lading; and that on the refusal of E. Williams & Co. to accept the draft he became entitled to the possession of the flour. Shaw, C. J. says : " By inserting the names of the defendants as consignees, they would derive no property in the flour or interest or title to it, nor any right to take possession of it, until effect should be given to it by a delivery to them by the shipper himself, or by some person duly authorized." The learned chief justice further held that the master had no authority from the shipper to deliver to the defendants his part of the bill of lading, and that they derived no title or authority under it. He also held that " even a sale or pledge of the property, without a formal bill of lading by the shipper, would operate as a good assignment of the property, and the delivery of an informal unindorsed bill of lading, or other documentary evidence of the shipper's property, would be a good symbolical delivery so as to vest the property in the vendee or pledgee."

These authorities very clearly show that the agreement between Foster and the bank, in connection with the delivery to the latter of the carrier's receipt, and the advance of the money on the draft, transferred the general property in the flour to the bank in trust.

I think that the transaction between Foster and the bank can also be regarded as either a mortgage or pledge of the flour to the bank. I am not aware that it is necessary to the validity of a mortgage of goods and chattels that it should be in writing, except so far as the act of 1833 in relation to the filing of mortgages of goods and chattels requires them to be in writing. That act declares that a mortgage not filed shall be void as against the creditors of the mortgagor and subsequent purchasers and mortgagees in good faith. The controversy here is not between a mortgagee whose mortgage is not filed, and a

creditor of the mortgagor or a subsequent purchaser or mortgagee. Jones, the defendant, appears here as a wrongdoer. He is not defending as a judgment execution creditor, or as a subsequent purchaser or mortgagee. The case does not [507] come within the statute of frauds, for not only was the purchase money, or rather the money loaned, paid, but there was a symbolical delivery of possession of the flour to the bank, by the delivery to the latter of the carrier's receipt.

The transaction may also be regarded as a pledge. Delivery of possession, which is essential to a pledge, here accompanied the pledge. The carrier held the goods as the mere servant of Foster. And the delivery of the carrier's receipt to the bank was a good symbolical delivery of the flour. It was as effective in transferring the possession as the delivery of the keys of a warehouse, or the receipt of a storekeeper. (5 *John.* 335, 344; 2 *Caines,* 44; 12 *Pick.* 297, 302; 2 *Kent's Com.* 500.) Justice Cowen in *Grosvenor* v. *Phillips,* (2 *Hill,* 147, 153,) says, that a conventional lien by way of pledge or mortgage " may as well be raised in the hands of the carrier, as a right by absolute sale. *Haille* v. *Smith,* (1 *Bos. & Pul.* 563,) was no more. The goods were there delivered to a carrier with a view to their being collateral security in the hands of the commission merchants for their advances to their principals." A pledge is defined by Judge Story to be a bailment of personal property as security for some debt or engagement. (*Story on Bail.* § 286.) In a mortgage of chattels the general property passes to the mortgagee. In a pledge a special property only passes to the pledgee, the general property remaining in the pledger. (4 *Kent.* 138; *Bouv. Dic. Pledge.*) The delivery of the carrier's receipt or bill of lading to the bank for a valuable consideration, passed to the bank the legal title to the same. The rule as to a bill of lading must be the same as the rule applicable to choses in action. The latter, even if specialties, may for a good and valuable consideration be transferred by delivery only. (19 *John.* 95; 17 *id.* 285, 292: 11 *id.* 534, 538; 1 *id.* 580, 590; *Rob. on Frauds,* 275; 2 *Bar.* 97, 8.) Ch. Justice Shaw in *Allen* v. *Williams,* (12 *Pick.* 302,) says in express terms,

that a sale or pledge of property without a formal bill of lading by the shipper is a good assignment of the property, and that [508] the delivery of an unindorsed bill of lading is a good symbolical delivery, so as to vest the property in the vendee or pledgee. (16 *Pick.* 467.)

If the transaction and agreement between Foster and the bank amounted to either a sale in trust or a mortgage, the general property passed to the bank. If it was a pledge, the bank acquired a special property in the flour. In either case the bank had a right to maintain trover against Jones for receiving and selling the flour. I am of opinion therefore that the decision of the supreme court should be reversed, and that a new trial be granted.

Judgment reversed.

BRONSON, Ch. J. and JEWETT, J. dissented.