## F. P. HALSEY v. JAMES S. WARDEN, *et al.*

1. BILL OF LADING, *Nature of.* As between the owner and shipper of the goods and the common carrier, the bill of lading fixes and determines the duty of the latter, as to the person to whom it is (at the time) the pleasure of the former that the goods shall be delivered; but there is nothing final or irrevocable in its nature. The owner of the goods may change his purpose, at any rate, before the delivery of the goods themselves, or of the bill of lading to the party named in it, and may order the delivery to be to some other person.

2. LIEN *upon Grain in hands of Consignee.* W. & W., bankers at Irving, Kansas, were the *bona fide* holders of two drafts drawn against three shipments of grain shipped to one H., at Atchison, Kansas, by the Central Branch Union Pacific railroad, with the bills of lading assigned, to secure the payment of the drafts. *Held,* That they had a lien upon the grain

in the hands of the consignee, and can recover from him the proceeds of the grain, to the extent of such drafts, even though the consignor be indebted to the consignee on general account.

### Error from Atchison District Court.

ACTION brought by *Warden & Walker*, partners, against *Halsey*, to recover certain damages. The nature of the action, and the facts, appear in the opinion. Trial at the June Term, 1879, of the district court, and verdict and judgment for the plaintiffs. Also, for the plaintiffs various special questions of fact were submitted to the jury, which with the answers thereto are as follows:

"1. On Aug. 31, 1878, were the plaintiffs partners, doing business under the firm-name of Warden & Walker, as bankers and brokers, at Irving, Kansas? A. Yes.

"2. As such bankers, were they engaged in loaning money and making advancements on bills of lading and consignments of goods, merchandise and grain? A. Yes.

"3. As such, have said plaintiffs been engaged in such business since October 1, 1877? A. Yes.

"4. Were the three bills of lading or receipts, copies of which are attached to plaintiffs' petition, as exhibits 'A,' 'B' and 'C,' issued and delivered to said M. R. Conley by the said Central Branch Union Pacific railroad company on account of grain delivered to it by M. R. Conley on the day of the dates thereof, to be transported by said railroad company to Atchison, Kansas? A. Yes.

"5. Did M. R. Conley, on Sept. 2, 1878, deliver two of said bills of lading (exhibits 'A' and 'B') to said plaintiffs, attached to said draft of $875 of same date? A. Yes.

"6. Did said plaintiffs on said date at the time they received said draft and bills of lading from said Conley, part with value and give credit to Conley in consideration of said draft and bills of lading? A. Yes.

"7. Did M. R. Conley, on September 3, 1878, deliver one of said bills of lading (exhibit 'C') to plaintiffs, attached to the draft of $215 of same date? A. Yes.

"8. Did plaintiffs on September 3, 1878, at the time they received said draft and bill of lading from Conley, part with value and give credit to Conley, in consideration of said draft and bill of lading? A. Yes.

"9. At the time when M. R. Conley delivered each of

said drafts to plaintiffs with the bills of lading, was not M. R. Conley indebted to plaintiffs in a large sum of money, for moneys by plaintiffs advanced to him for the purpose of buying the identical grain covered by the said bills of lading? A. Yes.

"10. For more than six months previous to September 2, 1878, did not the defendant have notice that M. R. Conley was engaged in shipping grain to defendant, and accustomed to draw drafts in favor of plaintiffs against such shipments, and transferring the bills of lading received by Conley on account of such shipments to plaintiffs? A. Yes.

"11. With such notice, did the defendant, previous to September 2, 1878, pay all such drafts so drawn on him by Conley in favor of the plaintiffs? A. Yes.

"12. Were not the conduct of defendant, and his course of dealing with Conley, of such a character as to induce the plaintiffs, in the exercise of ordinary prudence, to accept said drafts and said bills of lading under the belief that the net proceeds of said grain would be applied toward the payment of the drafts? A. Yes.

"13. For what length of time previous to September 2, 1878, had the defendant been paying drafts drawn by Conley in favor of plaintiffs, accompanied by bills of lading received for consignment of grain to defendant? A. Several months.

"14. Had defendant at any time previous to the presentation of the two drafts and the bills of lading set forth in plaintiffs' petition, ever refused payment of any other drafts drawn by Conley on defendant? A. No.

"15. At the time the plaintiffs received the drafts and bills of lading in question, or at any time previous thereto, did plaintiffs have notice of any contract or agreement between Conley and defendant, in any manner different from the general course of dealing that had existed between said parties previous to September 2, 1878? A. No.

"16. Did defendant receive the grain in controversy and refuse to apply the same or the proceeds thereof to the benefit of plaintiffs? A. Yes.

"17. What were the net proceeds of the grain covered by the three bills of lading? A. $854.66.

"18. Did defendant at any time previous to September 2, 1878, in any manner notify the plaintiffs that Conley had no right or authority to draw drafts on defendant in favor of plaintiffs, and transfer to plaintiffs bills of lading for con-

signments of grain to defendant, for the payment of said drafts? A. No.

"19. Previous to September 2, 1878, did plaintiffs as such bankers from time to time advance money to Conley for the purpose of enabling him to purchase the grain that he [Conley] would from time to time ship to defendant, upon the faith and credit that the bills of lading for such shipments would be turned over to plaintiffs to insure the payment of drafts drawn by Conley against such shipments to repay such advances? A. Yes.

"20. Did defendant refuse payment of the drafts in question? A. Yes.

"21. Was there any express agreement between the defendant and Conley that defendant should have a lien on the grain in controversy for previous advances made by defendant to Conley? A. No.

"22. Did Conley advise defendant by letter that he had drawn said drafts before defendant had actually received any of this grain? A. No."

For the defendant certain special questions were submitted, which, with the answers thereto, are as follows:

"1. Had Conley in cases of shipments to the two lots, the subjects of this controversy, invariably drawn drafts through plaintiffs on defendant therefor? A. Yes.

"2. Had Conley in cases of such previous shipments invariably drawn such drafts, with bills of lading attached, as security for such drafts? A. Not in every instance.

"3. Had Conley drawn on defendant through plaintiffs on August 30, 1878, by draft for $875? A. Yes.

"4. Had defendant at the time reason to believe that the second draft for $875 was drawn against the same consideration or shipment as that of the said $875 draft of August 30? A. No.

"5. Was the second draft for $875 drawn against the same consideration as the first draft for $875? A. No.

"6. Were said shipments of grain put on track by Conley, under contract with defendant for sale thereof and delivery of same to defendant, at Irving station? A. In part it was.

"7. Had defendant the right upon such shipments to receive such grain without then having possession of the bills of lading therefor? A. Yes.

"8. Did defendant obtain possession of such grain without

knowledge on his part that the plaintiffs had then any claim thereon? A. No.

" 9. Had defendant the actual possession of such grain before the delivery by Conley to plaintiffs of said bills? A. No.

" 10. Was defendant purchaser of such grain in good faith, without notice of any claim in favor of plaintiffs, or knowledge of facts which should have put him upon inquiry? A. Yes, he was. .

" 11. How much had Conley overdrawn his account with the defendant on such grain transactions at the time he drew the drafts, the subject of this action? A. $894.68.

" 12. Had defendant notice of such drafts in favor of plaintiffs before having credited Conley with the full value of such shipments? A. Yes.

" 13. Were said drafts drawn by Conley on his general account with defendant, or by him for the specific value of such special shipments? A. On general account."

*Halsey* brings the case here.

*W. W. Guthrie,* for plaintiff in error.

*Everest & Waggener,* for defendants in error.

The opinion of the court was delivered by

HORTON, C. J.: In the summer and fall of 1878, Warden & Walker were bankers and brokers at Irving, Kansas, and F. P. Halsey owned an elevator in Atchison, Kansas. During the same time, M. R. Conley was engaged in the grain business at Irving, shipping to F. P. Halsey his purchases by the Central Branch Union Pacific railroad company, which issued bills of lading on his shipments. For about six months before the date of the transactions hereinafter stated, Conley had been accustomed to draw drafts upon Halsey in favor of Warden & Walker against his shipments to the former, at the same time transferring to them the bills of lading received by him on account of the shipments. These drafts had always been paid, without objection. No notice had been given to Warden & Walker of any different or other contract or arrangement between the parties. Under this state of facts, on

August 31st and September 3d, 1878, Conley shipped by the Central Branch railroad to Halsey at Atchison, 184,000 pounds of corn, 23,000 pounds of barley, 23,000 pounds of wheat, and received three separate bills of lading. With the shipments, he drew two drafts on Halsey, payable to the order of Warden & Walker; one for $875, and the other for $215. Warden & Walker advanced said sums, taking as security the three bills of lading issued by the railroad company covering the shipments. The bills of lading were transferred to Warden & Walker before Halsey had actually received into his possession the grain from the railroad company at Atchison, and the moneys advanced to Conley by Warden & Walker were for the purpose of buying the identical grain embraced in the bills of lading, and so used by Conley. In due time, Halsey received the grain and realized from it $854.66. The drafts and bills of lading, pinned together, were seasonably presented to him, but he refused to pay the drafts, upon the excuse that Conley was owing him on general account. Conley had previously drawn drafts of $894.68 in excess of his accounts, but these drafts were not drawn for value of the special shipments of August 31st and September 3d. The drafts dishonored by Halsey were protested for non-acceptance. On December 6th, 1878, Warden & Walker filed their petition to recover of Halsey. On the trial, Conley testified, among other things, as follows:

"Q. You say you commenced the grain business with Halsey in October, 1877? A. About that time. I am not positive as to date.

"Q. You carried on your business by making shipments to him and drawing drafts through Warden & Walker's bank for the amount of sales? A. Yes, sir.

"Q. That is the way you did your business? A. Yes, sir.

"Q. Was that your invariable rule in your business with him? A. I never made a shipment without drawing on him.

"Q. How did you determine the amount of the proceeds to draw against? A. By my weights loaded in the cars.

"Q. Then you knew how much a bushel you were to get in Atchison? A. Not always.

"Q. In the shipments you made to Halsey in August,  .

1878, did you know how much you were to get a bushel in Atchison? A. On corn, I did.

"Q. You had a special contract with him by which the corn was sold to him at a fixed price per bushel? A. Yes; I sold him some corn at a certain price, to be delivered at a certain time.

"Q. You had contracted corn to him at a certain price per bushel? A. I had.

"Q. Was this corn put on the track at Irving, as expressed by these bills, under that contract? A. Yes, sir; the corn was.

"Q. Had you previously during the month of August, 1878, put other corn on track under the same circumstances? A. I think about the 15th of August I commenced delivering corn under this contract.

"Q. There had been previous contracts before? A. Yes, in the spring.

"Q. But the special contract for the corn contained in these shipments after the 15th of August was, I understand, under the contract of about the 15th of August? A. I don't understand what special contract you mean?

"Q. The corn you shipped about the 15th of August to Halsey was under special contract? A. It was the same as all previous contracts.

"Q. Under the contract you were to put the corn on the track for him at Irving station? A. No, sir, I think not. My understanding of the contract was, I was to deliver Mr. Halsey a certain amount of corn on the track at Atchison, subject to Atchison weights and inspection, at a certain price, and this was part of that contract.

"Q. When did you put the corn on the track for him? A. I loaded it on the cars at Irving.

"Q. Who paid the freight on the corn? A. That was paid at Atchison; Mr. Halsey paid that.

"Q. At that time was there any means of weighing corn at Irving? A. No, sir."

Halsey testified:

"Q. State what time you first had a business connection with M. R. Conley, the grain-man at Irving? A. October 31, 1877.

"Q. Do you recollect the circumstances of the contract with him for the shipment of corn or other grain in August, 1878? A. I do.

"Q. State what that contract was: whether for the ship-ment of corn, bulk wheat and barley; whether all together, or in what shape it was, and under what circumstances, and where the grain was delivered to you under it?    A. I sup-pose that the grain in dispute is in this shipment; the con-tract was made for the corn in it on the 12th of August, for 5,000 bushels at twenty-seven cents per bushel; the corn to be delivered in August at Irving, to grade number two corn, subject to Atchison weights and inspection.

"Q. Was it changed in any respect afterward?    A. I ex-tended the time afterward to run into September.

"Q. Was the contract changed about the 5,000 bushels of corn otherwise than the extension of time?    A. That was all.

"Q. State now under what circumstances of the contract the corn mentioned in these bills of lading was delivered to you?    A. The corn was delivered to me at Irving at different times; some of it was delivered to me before this time on the contract; the original contract was all to be delivered to me at Irving, in August.

"Q. Where was the corn to be delivered to you?    A. Ir-ving, Kansas.

"Q. Now state how it was as to the bulk wheat?    A. The bulk wheat was, I think, contracted about the 20th; I am not positive in regard to date.    There were some telegrams passed between us in regard to it, and some letters.    I am in the habit of purchasing—in fact, all my grain was purchased as this was.

"Q. State the fact, when it was and at what figure?    A. I think it was sixty for number three, seventy or seventy-one for number two, and forty-five no grade.

"Q. Where to be delivered?    A. Irving, Atchison weights and inspection.

"Q. State how it was about the barley?    A. In regard to the barley, I don't recollect the price agreed upon; I know when it came in; it was a lower grade of barley than I sup-posed when I purchased it."

The jury answered various questions of fact, and returned a verdict for Warden & Walker of $904.50.    The court re-mitted $266.03 of the amount, and entered judgment for $638.47.    Halsey brings the case here.

His counsel contends that no cause of action is stated in the petition; that the verdict is against the evidence; that the

charge of the court was erroneous—all of this upon the
theory that the bills of lading show upon their face the ship-
ments were made for the benefit of Halsey, the consignee;
that any transfer of the bills of lading made by Conley was
merely the assignment of his interest in the grain; that such
interest was limited to the balance, if any, due him on gen-
eral account; that the rights of the parties were such as they
would have been had Halsey stood at the Irving station when
the grain was placed upon the track, and then and there had
taken manual possession of it, and entered on his account
book a credit to Conley for its value. We cannot agree with
all that counsel asserts, and think he mistakes the rules of
construction adopted by the courts in ascertaining the real in-
tentions of the parties in like transactions. The rule is, that
as between the owner and shipper of the goods and the car-
rier, the bill of lading fixes and determines the duty of the
latter as to the person to whom it is (at the time) the pleas-
ure of the former that the goods shall be delivered; but
there is nothing final or irrevocable in its nature. The owner
of the goods may change his purpose, at any rate before the
delivery of the goods themselves or of the bill of lading to
the party named, and may order the delivery to some other per-
son than the consignee. The bill of lading is open to expla-
nation by parol. It may be shown to have been intended as
evidence of an absolute sale, a trust, a mortgage, a pledge, a
lien, or a mere agency; and when the bill of lading has not
been delivered to the consignee, and there has been no actual
delivery to him of the property, the right of transfer of the
goods by the general owner by transferring the bill of lading
to another is unquestioned. (*Bank v. Jones*, 4 N. Y. 497; *Con-
rad v. Atlantic Ins. Co.*, 1 Pet. 444; *Mitchell v. Ede*, 11 Ad. &
E. 888.)

The authorities also concur that a consignor, being the
owner, may create a lien on the property shipped before de-
livery to the consignee, by drawing drafts against the ship-
ment on the consignee and securing the same by the transfer
of the shipping bill, and that the consignee has no right to

disregard it. "The rule seems to be a salutary one, and one in fact without which the commercial business of the country could hardly be transacted. The crops of the west could scarcely be moved if this well-established business rule were now to be overturned, as every man at all familiar with affairs knows that the usual course of shipments and business transactions of this country is, that banks make advances on drafts drawn upon bills of lading or shipping bills of essentially the character of the ones before us." (*Lee v. Bowen,* 5 Biss. 154.)

In the case at bar, the grain had been bought with the money advanced by Warden & Walker. Conley was the owner of it before shipment. Notwithstanding his contract, he had full authority to sell to Warden & Walker, or to any other buyer, at Irving, or Atchison, or elsewhere. As no bill of lading was delivered to Halsey except as presented with the drafts attached, it is clearly evident that Conley's intention was to consign the grain to him only upon the condition of his accepting the drafts drawn against it. Therefore, he acquired no lien on the grain for the balance of his general account against Conley. The latter did not ship the grain to be applied upon his debts, and Halsey stands in the same relation to the property and parties as if he had been at Irving when the grain was being shipped, and been notified that such grain was not to be paid for by a credit on general account, but that he could only take the same by applying the proceeds toward the payment of the drafts of Warden & Walker.

Counsel seems to think that because these shipments were a part of a series of shipments to Halsey by Conley, and because Halsey was the purchaser of the grain at a contract price, the rules usually applicable to consignments of grain to a factor ought not to apply. Counsel overlooks the special findings. By the course of business adopted between Halsey and Conley for several months with Warden & Walker, Halsey had, to some extent, authorized Conley to draw drafts upon him for each shipment of grain. These drafts had always been paid by him, and before dishonoring like drafts, he

ought to have notified Warden & Walker that the account of Conley was overdrawn and future drafts would not be accepted. In our opinion, the fact that the previous transactions between all the parties had been conducted in the same way as the transfer of the bills of lading and the negotiations of the drafts in this case, greatly strengthens our conclusions in favor of the rightfulness of the judgment. (*Savings Bank v. A. T. & S. F. Rld. Co.*, 20 Kas. 519; *Emery's Sons v. Bank*, 25 Ohio St. 360; *Lee v. Bowen*, 5 Biss., *supra;* Benj. on Sales, § 381.)

Some of the instructions requested by counsel for Halsey ought to have been given, but these only affect the general verdict, and as the special findings of fact clearly establish the right of Warden & Walker to recover, no error prejudicial to the plaintiff in error appears thereon.

As two of the bills of lading were issued upon one day, and transferred to secure one draft, and as the other bill of lading was issued on another day, and transferred to secure an additional draft, only two causes of action existed. These were separately stated and numbered in the petition; therefore the petition was sufficient in form. It was not necessary to denominate the action *ex contractu*, or *tort*, nor would it have been proper to do so. The real facts constituting the cause of action should be set forth just as they actually occurred, and to resort to one of the old common counts in a petition is not to state the real facts, but to adopt fictions in pleading which have been expressly abolished by the code.

These conclusions force us to the position that the petition states causes of action; that the verdict after being reduced by the court is supported by sufficient evidence, and that the directions to the jury worked no prejudice to the rights of plaintiff in error.

The judgment of the district court will therefore be affirmed.

All the Justices concurring.