## LINEKER *vs.* AYESHFORD.

The endorsement of a bill of lading, *prima facie*, vests the property in the goods mentioned therein in the endorsee: but a bill of lading is not a negotiable instrument so far as to enable an endorsee, who has no property, either general or special in the goods, and no lien thereon for advances or otherwise, to sue the master of a ship, in his own name, for the non-delivery of the goods, when it appears on the face of the complaint that the plaintiff, the endorsee, is a mere naked agent of the shippers.

An agent, ordinarily, cannot sue in his own name in respect to the subject matter of his agency; and this rule applies to consignees and endorsees of bills of lading, when they are, in truth, but the agents of the shippers.

Lineker *v.* Ayeshford.

It is no defence to a suit on a negotiable bill of exchange that the suit is brought in the name of a mere agent or stranger. *Per* BENNETT, J.

Nor is it, of itself, any defence to a suit on a negotiable bill of exchange, that the suit is brought in the name of a fictitious person. *Per* BENNETT, J. HASTINGS, Ch. J. dissenting.

A. of *Liverpool, shipped certain goods to San Francisco, and endorsed the bills of la-ding to the plaintiff, his agent, and became a bankrupt before the arrival of the goods. Held,* it appearing on the face of the complaint that the plaintiff was a mere naked agent of the shippers, that he could not recover the goods in his own name of the master of the ship, who claimed to hold the goods for the assignees in bankruptcy of A.

APPEAL from the court of First Instance of the district of San Francisco. All material facts are stated in the opinion of the court. The cause was argued by

*Gregory Yale,* for the plaintiff.

*Horace Hawes,* for the defendant.

*By the Court.* BENNETT, J. On the 12th day of February, A.D. 1849, Carsten, Spitzer & Co., and Shelpnor, Lomer & Co., two mercantile firms of Liverpool, shipped on the British ship " Antelope," then lying at Liverpool, and of which the defendant was master, certain merchandise for the port of San Francisco. There were two bills of lading signed by the defendant, in one of which the firm of Carsten, Spitzer & Co. appear as the shippers, and in the other, the firm of Shelpnor, Lomer & Co., and both bills call for the delivery of the goods mentioned therein " unto order or to assigns," and acknowledge the payment of the freight in Liverpool. On the one bill of lading is the following endorsement: " Deliver the within to Thomas H. Lineker or order," (signed) " Carsten, Spitzer & Co."; and on the other is a blank endorsement of Shelpnor, Lomer & Co., and then a special endorsement by Carsten, Spitzer & Co. in the same words as the endorsement first above mentioned. On the arrival of the ship at San Francisco, the defendant refused to deliver the contents of the bills of lading to Lineker, claiming to hold them on behalf of the assignees in bankruptcy of

Lineker *v.* Ayeshford.

the shippers, and Lineker accordingly brought this suit to recover their value.

The plaintiff alleges in his petition, " that he is the author-" ized *agent of Carsten, Spitzer & Co.*, and that, *as such, he is* " *the holder* of two certain bills of lading signed by Miles J. " Ayeshford, captain of the ship ' Antelope,' a British ship now " in this port, and that the said bills of lading call for sundry " boxes, bales, packages, casks, &c., goods *shipped on account* " *of said Carsten, Spitzer & Co.* The petition further sets forth that such goods are daily decreasing in value, and that " dama-" ges may result irreparable *to those your petitioner represents*, " if the law does not interfere for their protection,"—and that the plaintiff is apprehensive " that the ship will depart and " carry off the aforesaid goods of your petitioner, and those he " represents will be defrauded of their just rights in the same." It is also averred that the plaintiff, in expectation that the bills of lading would be complied with, has rented a house and lot for the purpose of establishing himself as a merchant in San Francisco, and that in consequence thereof, and of the depreciation in the value of the goods in question occasioned by the constant arrivals of goods of a similar description, he and those he represents have incurred damages to the amount of two thousand dollars.

After a great variety of proceedings in the course of the cause, consisting of answers, exceptions, affidavits, orders, arguments, and testimony, judgment was finally rendered by the court below in favor of the plaintiff for seven thousand dollars, the value of the goods at this port, eight hundred dollars for the damages sustained by the plaintiff for the detention, and three hundred and thirty dollars costs of suit. From this judgment the appeal is taken.

Upon the argument numerous points were raised by the counsel for the appellant, involving not only the regularity of the proceedings but the jurisdiction of the court below, which, however, the view this court takes of the case renders it unnecessary to examine. The question principally discussed at the bar, and the one which chiefly attracted our interest, was whether

the plaintiff could maintain the action in his own name, and upon the solution of this question our judgment will be based.

It is claimed by the counsel for the appellant, that the plaintiff has no property either general or special in the goods mentioned in the bills of lading, and no beneficial interest therein, either by way of lien or otherwise, and that, appearing as the naked agent of Carsten, Spitzer & Co., he cannot in that character maintain his action; whilst on the other side it is insisted, that bills of lading are negotiable instruments, and that, in this case, the endorsement of the bills transferred to the plaintiff the property in the goods, and constituted him the legal owner—and that, even if this were not so to that extent, yet the plaintiff should be regarded as a factor or commission merchant, and that, viewed in this light, he has a sufficient interest in the goods to entitle him to sue in his own name.

If the action can be sustained, we think it must be upon one of the two following grounds: First, that a bill of lading is a negotiable instrument to the same extent and with the same effect as a bill of exchange; or secondly, that the plaintiff had some property in the goods in question either general or special, or some lien upon them as factor or otherwise. Unless one of these two propositions can be sustained, we see no reason why the defendant should be made liable to the plaintiff more than to any other stranger for the value of the goods.

First, then, is a bill of lading a negotiable instrument? If it be so, in the sense of the negotiability of bills of exchange, then this suit may be sustained by the plaintiff wholly independent of the question whether he has any interest in the goods mentioned in the bills of lading or not; for it is elementary law, in support of which no authorities need be cited, that a suit may be brought upon a negotiable bill of exchange in the name of a fictitious person, or in the name of a mere agent or stranger; and that, even though it should clearly appear, in the former case, that the plaintiff was a fictitious person, and in the latter, that he was a naked agent or stranger, having no interest whatever in the money sought to be recovered, yet in neither event could the action for that reason be defeated. That

Lineker *v.* Ayeshford.

a bill of lading may, like all other contracts, be assigned and the property in the goods therein mentioned be transferred to the assignee, admits of no doubt; and it matters not whether such assignment be made in full, or in the abbreviated form of a simple endorsement. But that is a very different thing from negotiability.

We are aware that not only in text books, but even in the dicta of judges of no inconsiderable authority, bills of lading are said to be susceptible of negotiation. Such is the doctrine advanced in *Smith's Mercantile Law,* 287; and in *Thompson* v. *Downing,* (14 *Meeson & Welsby,* 403,) a bill of lading is spoken of as *quasi* negotiable; but we do not know of any one case in which the doctrine of negotiability has been carried out into an express adjudication. The point is alluded to by Chancellor Kent, (2 *Comm.* 547, 548,) who says that it remains to a certain degree, still floating and unsettled; and this also appears to be the condition of the question under the civil law. (*Id.* 548, *note* "*e*".) In the American note to *Lickbarrow* v. *Mason,* (1 *Smith's Leading Cases,* 649,) the whole matter is very ably and elaborately reviewed and discussed, and the conclusion is deduced from a full examination of all the authorities both English and American, that a bill of lading is not a negotiable instrument. In *Thompson* v. *Downing* above cited, although it was conceded that an endorsement and delivery of a bill of lading might vest the title to the goods while *in transitu* in the endorsee, yet it was held that the instrument was not negotiable, and that suit could not be brought upon it in the name of the endorsee; and we think that the opinion expressed in *Birckhead* v. *Brown,* (5 *Hill,* 635, 646,) that in this country, no instruments are negotiable but regular promissory notes and bills of exchange, appears to be entirely correct. A bill of lading, then, not being a negotiable instrument like a bill of exchange, the plaintiff cannot recover in his own name upon the contract itself, independent of the question of his ownership of the goods—and if he can recover at all, it must be under the second proposition above stated, that he has some property in, or lien upon, the contents of the bills of lading.

Secondly. Has, then, the plaintiff any property in the goods, or any lien upon them? He is not the general owner—the petition itself clearly shows that Carsten, Spitzer & Co. are the general owners. He has no special property, for the case falls within none of the several classes of bailments. And he has no lien—for the goods never came to his possession. What is meant by the term lien? Possession is always essential to its existence. It is a right in one man to retain that, *which is in his possession*, belonging to another, until certain demands of the person in possession are satisfied. (*Story on Agency*, § 352.) and the lien of agents falls within the definition; (*Id.* § 353,) It is true that in section 361 the author says, where property is at sea, the delivery and endorsement of the bill of lading will confer a constructive possession, sufficient to create a lien; but it is manifest that he intends to limit that rule to cases in which advances have been made, or bills accepted, or incidental charges incurred upon the faith of the shipment. (*See* § 377.) In the case at bar no advances have been made, no bills accepted, and no incidental charges incurred, and the plaintiff can claim no benefit from that rule. The same distinguished jurist further says, (*see* § 361,) that if the thing has not yet arrived to the possession of the party, but is still *in transitu*, or if he has only a right of possession, the lien does not attach thereon. Chancellor Kent's rule is even more restrictive of the right of lien, than that laid down by Judge Story. Possession of the goods, he says, (2 *Kent's Comm.* 638,) is necessary to create the lien; and the right does not extend to debts which accrued before the character of factor commenced, nor where the goods do not, in fact, come to the factor's hands, even though he may have accepted bills upon the faith of the consignment, and paid part of the freight: and again at page 639 he declares, that possession is not only essential to the creation, but also to the continuance of the lien. In *Ryberg* v. *Snell*, (2 *Wash. C. C. Rep.* 403,) it is held, that the receipt of a bill of lading by a factor, to whom his principal is indebted, will not amount to constructive possession of such goods, nor give a right of lien on them for the balance of accounts; and in *Walter* v. *Ross*, (*Id.* 283,) it is held

Lineker *v.* Ayeshford.

that the goods themselves must come to the factor's hands, in order that the lien should attach, and that the owner may prevent it from attaching, either by selling the goods before this occurs, to a third party, or by revoking the factor's authority and entrusting them to another person.

We have thus far seen that, a bill of lading not being negotiable, and the plaintiff having no property in the goods in controversy, and no lien upon them, there is no *principle* of law upon which this action can be sustained. The only remaining inquiry, therefore, is whether this case comes within any of those classes of cases, which appear to have been decided, not only upon no principle, but in direct violation of all principle. It is by no means intended to find fault with the doctrine, that if a bill of lading be assigned by the consignee *bona fide*, for a valuable consideration, and without notice of any adverse interest, the property in the goods mentioned therein becomes vested in the endorsee. This is settled by the case of *Lickbarrow* v. *Mason*, before referred to, and the rule has been adhered to both in England and in this country ever since that decision. (2 *Kent's Comm.* 548, 549.) Neither is it intended to question the position that the consignee or endorsee of a bill of lading is in general to be deemed *prima facie* the owner of the goods, if they are shipped on account and risk of the consignee. But the *prima facie* case made by the bill of lading is liable to be rebutted. The instrument itself is but a receipt, which may be opened to let in evidence of the real facts—it may be explained as to the quantity of property shipped—it may be contradicted as to the shipment of all the articles mentioned—it may be shown that it was the intention of the parties that the property should not vest in pursuance of its terms—and even after endorsement it is capable of explanation to show the real intent of the endorsement. (*Abbott on Shipping*, 401 to 405, and 414 *in note ;* 1 *Chitty Pl.* 5, 6, *Ed.* 1840.) Whether the plaintiff, then, is to be regarded as consignee or endorsee, it is competent to examine into the real nature of the case, and ascertain from evidence beyond the bill of lading what his true position was. This evidence, being proof of record, and consequently,

the highest that could be adduced, the plaintiff himself has furnished upon the face of his own petition—from which it appears that, whatever may have been his *prima facie* position by virtue of the endorsement of the bills of lading, his true character is not that either of consignee or of endorsee, but that of naked agent of the shippers; and we have seen that, upon principle, he cannot maintain his action. How then does the case stand upon positive authority?

An agent, ordinarily, is not entitled to sue in respect to the subject matter of his agency. (1 *Chitty Pl.* 6, 7; *Story on Agency*, 486, § 391.) And this rule has been strictly applied in numerous cases, where suits have been brought by consignees and endorsees of bills of lading, who were in reality only agents of the shippers. These cases are collected and reviewed at considerable length in *Abbott on Shipping*, in the chapter which treats of the " contract for conveyance in a gen- " eral ship"; and the result which is deduced therefrom by the author (*pp.* 411, 414,) appears to be in substance, that if the person to whom the delivery is ordered by the bill of lading, is only the agent of the shipper, and has no property in the goods, he cannot maintain an action in his own name against the master for not delivering them—not in assumpsit, for the contract in the bill of lading was not made with him, but with a third person, the consignor of the goods—not in trover, because no property having passed to him, *he can have no right to complain of their non-delivery or conversion as an injury to himself.* These reasons why an action cannot be maintained by an agent, appear to us to be entirely conclusive. Yet in *Morrison* v. *Gray*, (2 *Bing.* 260,) and in *Griffith* v. *Ingledew*, (6 *Serg. and R.* 429,) the courts came to a different conclusion. These cases seem to proceed on the principle, that the legal property, as distinguished from the equitable interest, in a bill of lading and in the goods mentioned therein, is in the consignee or endorsee, though he be but agent; whereas we apprehend, that, with the exception of these two cases and an anonymous decision of Lord Ellenborough cited in *Paley on Agency*, 364, it has always been held that the legal property in a chose in action re-

Lineker *v.* Ayeshford.

mained in the assignor notwithstanding the assignment. The view taken in *Gordon* v. *Howland*, (2 *Pick.* 599,) presents the effect of the delivery or endorsement of a bill of lading in its true light; which is, that neither the one nor the other has any effect in passing property, except as evidence of a sale of such property, or as amounting to a symbolical delivery, and having the same effect as the sale would have had, in the absence of the bill, on the delivery of any other symbol of possession; so that where property is sold, and the bill of lading at the same time endorsed, it is the bargain and sale which take effect, and not the mere fact of endorsement. This being so, we see no ground upon which the doctrine of *Morrison* v. *Gray*, and *Griffith* v. *Ingledew*, that the legal property in the goods may be in the endorsee of a bill of lading, where he is shown to be a mere agent, can be supported.

We were referred upon the argument, to cases in which it has been held that factors may sue in their own names; but those were cases where the goods had come into the actual possession of the factor, and where by reason of such possession he had a special property in them, and was entitled to maintain an action for injuries to them, and, when sold, for the price. But the plaintiff can claim nothing from those cases, for he never had the possession.

Our conclusion, then, is, that a mere agent of the shippers, whether called by the name of factor, commission merchant, consignee or endorsee, having no property in the goods either general or special, and no lien upon them for advances or otherwise, cannot maintain an action for their non-delivery against the ship-owner or master, who claims to hold the goods for the assignees of the shippers.

The judgment of the court below must, therefore, be reversed, and the proceedings remitted to the district court of the district of San Francisco, in order that judgment may there be entered for the defendant for his costs in this court and in the court below.

Ordered accordingly.

HASTINGS, Ch. J. From that part of the above opinion which declares that "it is elementary law, in support of "which, no authority need be cited that a suit may be brought "upon a bill of exchange in the name of a fictitious person," I dissent.

Though the above language is *obiter dictum* and of no binding authority, yet it is well known that *obiter dicta* are often quoted as authority, and are generally received as such, their weight depending much upon the character of the court that utters them, and the positive language used in expressing them. I do not think authority can be cited in support of the above doctrine, and so far from its being correct every writer upon bills of exchange and promissory notes asserts the contrary in effect.

Chitty in his work on Bills, (*p.* 158,) says : " A bill payable "to a fictitious person or his order, is in effect a bill payable to "bearer, and may be declared on as such in favor of a *bona fide* "holder ignorant of the fact.   But if the plaintiff himself at the "time he received such a bill knew of the payee being fictitious "and discounted the bill for the benefit of the drawer, he can- "not recover against the acceptor although he also accepted "with full knowledge of the fact."

If the above doctrine be correct, any one can readily conceive with what facility our records may be made up of fictitious beings, mere shadows.  Besides, this doctrine is fraught with much mischief; it encourages the drawing of bills in favor of fictitious parties; a practice which has always been condemned by the courts of England, as such bills were at one time both in England and France employed as a cloak for usury and fraud.