[No. 7,241.—In Bank.]
Sept. 27, 1882.

## J. H. DODGE v. DANIEL MEYER.

BILL-OF LADING— INDORSEMENT OR DELIVERY OF—TRANSFER OF GOODS. A bill of lading represents the property for which it has been given, and by its indorsement or delivery ,without indorsement the property in the goods may be transferred where such is the intent with which the indorsement or delivery is made.

ID.—By the rules of commercial law bills of lading are regarded as symbols of the property therein described, and the delivery of such bill by one having an interest in or a right to control the property is equivalent to a delivery of the property itself. A consignor who has reserved the "*jus disponendi*" may effectuate a sale or pledge of the property consigned by delivery of the bill of lading to the purchaser or pledgee as completely as if the property were in fact delivered.

ID.— DRAFT— SPECIAL PROPERTY IN GOODS.—A person purchasing a draft drawn by the shipper of the goods with a bill of lading accompanying it has a special property in the goods covered by the bill of lading; usually in the case of a time draft this special property vests in the purchaser of the draft as security for its acceptance. It may be, if so agreed between the shipper and the purchaser of the draft, that the purchaser will have a right to retain the bill of lading, and thus retain his special property in the goods shipped, not only for the acceptance but for the payment of the draft.

ID.—The indorsee of the bill of lading who has purchased the draft accompanied by such bill of lading has a special property in the goods, and has the bill of lading and the shipment it represents for its security.

CARRIER'S RECEIPT—BILL OF LADING.—Under the facts of this case there is no difference between a carrier's receipt and a bill of lading.

TROVER— CONVERSION.—The action of trover being founded on a conjoint right of property and possession, any act of the defendant which nega-

tives or is inconsistent with such right amounts in law to a conversion. It is not necessary to a conversion that there should be a manual taking of the thing in question by the defendant, nor is it necessary to be shown that he has applied it to his own use. If he exercises a dominion over the thing, whether for the use of himself or another in exclusion or in defiance of the plaintiff's right, this is in law a conversion.

JUS TERTII—WHEN DEFENSE TO BAILEE AS AGAINST BAILOR.—A bailee can not in an action brought against him by his bailor, set up the title of a third person except by the authorization of that person.

CONVERSION BY PLEDGEE OF FACTOR.—Upon the facts of this case—

*Held :* That the defendant was a pledgee of the factors of the plaintiff and his assignors and was not an indorsee in good faith of the bills of lading representing the wheat in controversy, which wheat defendant received in pledge and converted to his own use.

APPEAL by defendant from a judgment for the plaintiff in the District Court of the Fourth Judicial District of the State of California, in and for the City and County of San Francisco, and from an order of the Superior Court of the same city and county denying a motion for a new trial. EVANS, J.

Action in the nature of trover for the conversion of wheat. The facts are stated in the opinion of the Court.

*Delos Lake* and *S. Rosenbaum,* for Appellant.

1. The plaintiff and his assignors had divested themselves of the right to the possession of the wheat, by placing it on board of vessels for transportation to Europe, under contracts of affreightment, as evidenced by the bills of lading. The wheat was in lawful possession of the master, by the owners' consent. The owners, therefore, could not maintain trover.

In trover the plaintiff must show a right to the immediate possession of the property alleged to be converted. (*Gordon* v. *Harper,* 7 T. R. 9; *Bruce* v. *Westervelt,* 2 E. D. Smith, 440; *Spoor* v. *Holland,* 8 Wend. 445; S. C., 24 Am. Dec. 37; 2 Greenl. Ev. § 636; *Hotchkiss* v. *McVickar,* 12 John. 403; *Salt Springs National Bank* v. *Wheeler,* 48 N. Y. 492.)

2. The taking and transmitting the bills of lading to the drawer of the bills of exchange, in compliance with the terms of the letter of credit, did not constitute a conversion. See authorities below.

3. If the Court did not err in finding that the transaction constituted a pledge, still there was no conversion, since the

defendants never intermeddled with the wheat, nor made any use of the bills of lading, nor exercised any dominion over it. A conversion consists of the appropriation of the thing to the party's own use and beneficial enjoyment, or in its destruction, or in exercising dominion over it in defiance of the plaintiff's right, or in withholding it under a claim of title. All of these elements are wanting in this case. (*Cobb v. Dows*, 9 Barb. 242; *The Matteawan Co. v. Bentley*, 13 Barb. 641; *Bailey v. Adams*, 14 Wend. 202; *Leonard v. Tidd*, 3 Metcalf, 6.)

What acts constitute conversion—what not. (*Mallalieu v. Laugher*, 3 Car. & P. 551; *Herron v. Hughes*, 25 Cal. 559; *Bristol v. Burt*, 7 Johns. 254, citing definition in note to •6 Bac. Abr. 677; S. C., 5 Am. Dec. 264; *Fowler v. Hollins*, 7 L. R., Q. B., 627; *Davis v. Buffum*, 51 Me. 163; *Fuller v. Tabor*, 39 Me. 522; *Burnside v. Twitchell*, 43 N. H. 390; *Mills v. Van Camp*, 41 Mich. 645; *Andrews v. Shattuck*, 32 Barb. 396; *Irish v. Cloyes*, 8 Vt. 30; S. C., 30 Am. Dec. 446; *Traylor v. Horrall*, 4 Blackf. 317).

It is claimed that the title to the wheat was, by the reception of the bills of lading, vested *ipso facto* in the Meyers, and made them trespassers; and in order to sustain this judgment, such claim must be sustained; for whenever trover will lie for an unlawful taking, as distinguished from an unlawful detention, trespass will lie. This is elementary law. (1 Chit. Pl. 176, and cases cited; 6 Waits' Actions and Defenses, 128, 129.) The proposition contended for finds no sanction in the law, and is not supported by a solitary judicial decision. (*Saltus v. Everett*, 20 Wend. 267; S. C., 32 Am. Dec. 541.)

*E. S. Pillsbury, A. W. Thompson* and *Robert S. Wade*, for Respondent.

1. "If an agent tortiously converts the property of his principal, as if he sells or pledges it to a third person, without right or authority, the latter will be liable equally with the agent for the conversion. This doctrine applies in all cases where the third person knew of and participated in the illegal or unauthorized act of conversion." (Story on Agency § 437; *McCombie v. Davies*, 6 East, 517; *Baldwin v. Cole*, 6 Mod. 212; *Thrall v. Lathrop*, 30 Vt. 310; *Holton v. Smith*, 7 N. H. 446;

*Jackson* v. *Anderson,* 4 Taunt. 29; *Scriber* v. *Masten,* 11 Cal. 303; *Bonitz* v. *Masquera,* 1 Bosw. 427; *Mackey* v. *Dillinger,* 77 Pa. St. 85; *Bell* v. *Cummings,* 3 Sneed. 281; *Buckmaster* v. *Mower,* 21 Vt. 204; *Courtis* v. *Cane,* 32 id. 232; *Stanley* v. *Gaylord,* 1 Cush. 546; *Gilmore* v. *Newton,* 9 Allen, 171; *Nichols* v. *Michael,* 23 N. Y. 271; *Covell* v. *Hill,* 2 Seld. 374; *Everett* v. *Saltus,* 15 Wend. 475; *Hanna* v. *Flint,* 14 Cal. 75; 2 Greenlf. Ev. Sec. 640; *Loeschman* v. *Machin,* 2 Stark. 311.)

An actual corporeal possession of the property is not necessary to constitute the conversion. (*Connah* v. *Hale,* 23 Wend. 466; *Phillips* v. *Hall,* 8 id. 610; *Bristol* v. *Burt,* 7 Johns. 257; S. C., 5 Am. Dec. 264; *Shotwell* v. *Few,* 7 id. 302.)

2. The indorsement and delivery of the "mate's receipts" constituted a pledge of the wheat. The parties so intended it and such was its effect; the master of the ship, permitting them to be issued, made himself responsible to Morgan's Sons for the wheat represented by them, agreed to account for it to that firm; for the time being the mate's receipts were *prima facie* evidence of ownership of the property, and a contract to hold it for the party to whom the receipt was issued and delivered; this contract was assignable by indorsement and delivery. (Civil Code, Sec. 1459.) In *Parker* v. *Baxter,* 86 N. Y. 586, held that similar receipts indorsed and delivered, as were these, constituted a delivery of the corn.

3. The indorsement and delivery of the bill of lading was a delivery of the wheat. When goods are shipped or afloat the bill of lading represents them, and the indorsement and delivery of it has exactly the same effect as the delivery of the goods themselves. (*Indiana National Bank* v. *Colgate,* 4 Daly, 41; *First National Bank* v. *Kelly,* 57 N. Y. 34; *Marine Bank* v. *Fiske,* 71 N. Y. 353; *Shaw* v. *Railroad Company,* 11 Otto, 565; *Wheeler & Wilson* v. *Givan,* 4 L. and Eq. Rep. 26; *Lickbarrow* v. *Mason,* Smith's L. C., 7th Ed., 1167; *Bank of Rochester* v. *Jones,* 4 N. Y. 497; *Dow* v. *Greene,* 32 Barb. 506; *Farmers'. & Mec. Bank* v. *Hazeltine,* 78 id. 108; *Davis* v. *Russell,* 52 Cal. 611.)

4. Defendant's assumption of control of the wheat, without the owners' consent, was a conversion of it. A conversion consists in exercising dominion over property in exclusion of the rights of the owner or lawful possessor, or in withholding

the possession from him under a claim of title inconsistent with his own, as well as in the appropriation of it to the party's own use and benefit, or in its destruction. (2 Bouv. Ins. § 3525; *Kennett* v. *Robinson*, 2 J. J. Marsh, 84; *Connah* v. *Hale*, 23 Wend. 462.)

As against the plaintiff, both Morgan's Sons and defendant were wrong-doers; but as among themselves, the defendant was absolutely dominant. (*Marine Bank* v. *Wright*, 48 N. Y. 1; *Allen* v. *Williams*, 12 Pick. 302; *Gardner* v. *Howland*, 19 Mass. 602; *Stollenwerck* v. *Thacher*, 115 id. 226; *National Bank* v. *Dearborn*, id. 219; *National Bank* v. *Bayley*, id. 228; *Dows* v. *Greene*, 32 Barb. 506–8.)

5. Changing the terms of the bailment was a conversion. Morgan's Sons, with defendant's co-operation, entirely changed the relation of all parties to the wheat, brought about a condition of things entirely different from that intended by the owners of the property, and agreed upon as the terms of the bailment.

See, also, *Fenn* v. *Bittleston*, 8 Eng. L. & Eq. 485; *Cooper* v. *Willamott*, 1 C. B. 672; *Sanborn* v. *Colman*, 6 N. H. 14; S. C., 23 Am. Dec. 703; *Farrant* v. *Thompson*, 2 Dow. & Ry. 1; 3 Stark. Ev. 1492–1500; Story on Agency, § 437; *Bryant* v. *Wardell*, 2 Ex. 479; Story on Bailments, c. 2, § 105; *Angus* v. *Dickerson*, Meigg's Tenn. 459; *Swift* v. *Moseby*, 10 Vt. 208; *Grant* v. *King*, 14 id. 367.

THORNTON, J.:

In the year 1874, and prior thereto, E. E. Morgan's Sons were factors and commission merchants, and doing business as such in the City and County of San Francisco. They were extensively engaged during the period referred to in chartering ships, and transporting wheat and other produce to European ports, to be there sold for account and risk of the owners of such property. The plaintiff and his assignors were farmers in the interior of the State, engaged in raising wheat. The Court finds a full assignment to the plaintiff by the owners of the several lots of the wheat, and all rights and causes of action against defendant.

In 1874, the plaintiff and his assignors made an arrangement with Morgan's Sons for shipping certain wheat owned

by them to England, and its sale there. The terms of such agreement were as follows:

Morgan's Sons were to charter a certain ship, to wit, the ship Star of Scotia, especially for the farmers (the plaintiff. and his assignors), and therein to ship for them their wheat to England, the farmers to retain control thereof as to time, place, and terms of sale, and as to whether the wheat was to be sold afloat prior to arrival in England, or on arrival there, or be stored and held there for a market—the factors (Morgan's Sons) to pay the inland freight to the ship, and shipping charges, putting the wheat on board ship, and if desired, make to the farmers severally such further advances in money, on their respective lots of wheat, as in the aggregate, with the inland freight and charges, would amount to twenty dollars per ton of the wheat; Morgan's Sons to attend to making sales of the wheat, at such time and place as directed by the farmers, and in remuneration for such services, they (Morgan's Sons) were to receive a stipulated interest on the advances made, and a commission on the price realized when the wheat should be sold.

These farmers sent forward from the interior their several lots of wheat to Morgan's Sons in September and October, 1874, who received them at divers times between the first of September and the sixteenth of October, 1874. Morgan's Sons had during the period last named chartered and had ready for loading in the bay of San Francisco five ships, viz., St. Charles, Star of Scotia, El Dorado, Oberon, and Twilight, and on receipt of the lots of wheat above mentioned, instead of loading them all on the ship Star of Scotia, they were without the knowledge of these farmers put on board the five several ships whose names are given above. They also, without the knowledge or consent of either of the farmers who owned the several lots of wheat, agreed to pay a different and generally higher rate of freight than that agreed on with the owners of the wheat.

In June, 1874, Morgan's Sons had procured special letters of credit from several merchants and bankers in England, and among others from Rathbone Bros. & Co. and Brown, Jansen & Co., whereby the former were authorized to draw their drafts at sixty days' sight upon the parties issuing the letters

of credit, to amounts specified therein, against shipping documents, viz., invoice bills of lading and policy of insurance for wheat shipped at California, at the rate of forty-two shillings and sixpence per quarter cost, freight and insurance; the documents to be surrendered to the drawees of the drafts against their acceptances.

In the same year, and after the obtaining of these letters of credit, Morgan's Sons became indebted to the defendant Meyer, and before any of the wheat above referred to had been forwarded to them for shipment they made arrangements with Meyer to use the wheat which they expected to receive and to comply with the credits in the following manner: They (Morgan's Sons) to ship the wheat to England, take out bills of lading therefor in their own name, and draw against them as provided in the credits, and to secure acceptance thereof to said Meyer, to pledge the wheat by delivering to him the bills of lading, indorsed by them in blank, accompanied with the other shipping documents, and Meyer, on acceptance of the drafts, to deliver to the drawees thereof, for their security and reimbursement, the shipping documents above mentioned. Meyer was to make advances to Morgan's Sons from time to time as required, and credit them with the drafts as fast as they were drawn and delivered to him by Morgan's Sons. Morgan's Sons were when this arrangement was made insolvent, and did not expect to have any wheat of their own for shipment. They relied wholly on the arrangement made with Meyer to carry out the agreement made with the farmers to ship their wheat as above detailed. Meyer knew all the time the facts above stated, but the farmers knew nothing of the letters of credit or their terms.

When the wheat to be shipped had been placed on board the vessels, Morgan's Sons procured from the master of each ship bills of lading in their name. The bills of lading were made out for the whole or the major part of each cargo, and none were taken in the name of either of the farmers; but Morgan's Sons had included in the bills of lading the several lots of wheat owned by the farmers and shipped for their risk and account with wheat of other persons, and so mingled their wheat that it was in no manner distinguishable from the entire mass of the cargo. The bills of lading represented

Morgan's Sons as the shippers, and provided that the wheat mentioned in them should be delivered to the order of Morgan's Sons or their assigns on the arrival of the ships at their several ports of destination in Europe.

Morgan's Sons were indebted to Meyer in divers sums of money, to them lent and advanced by Meyer prior to the times the wheat of the farmers was received by them, and while the shipments of the wheat were being made, Meyer advanced to them further sums of money from time to time, to be by them used in their business, in anticipation of the delivery to him by them of the drafts to be drawn on the parties in England, who had issued the credits above mentioned, against the wheat shipped, in pursuance of the arrangement above stated.

The course of business between Morgan's Sons and Meyer, is thus stated in the findings of the Court below:

"As loans and advances were made from time to time by defendant to E. E. Morgan's Sons, promissory notes were given by said Morgan's Sons to defendant for the amounts so loaned or advanced. As the wheat was being put into the ships from day to day, said E. E. Morgan's Sons took from the mates of said vessels 'mates' receipts' for the quantity loaded, and delivered said mates' receipts to defendant as his security for said loans and advances, and the said promissory notes; and when said ships were loaded, and bills of lading receivable, an accounting was had between said E. E. Morgan's Sons and defendant, the mates' receipts were delivered to the masters of the ships and bills of lading taken from the masters by said E. E. Morgan's Sons in their firm name, and to their own order.

"Immediately upon receipt of each of said bills of lading, E. E. Morgan's Sons drew their draft against the wheat therein mentioned, and in conformity with the terms of said letters of credit procured a policy of insurance upon the cargo represented by such bills of lading, and made an invoice of said wheat and indorsed the draft, bill of lading, policy of insurance and invoice, all in blank, and delivered the same to defendant.

"The drafts, so accompanied with said shipping documents, were then delivered to and taken by defendant at a sum fixed

upon by him and said E. E. Morgan's Sons, and the sum so fixed upon was applied in part to payments of the amounts due by said E. E. Morgan's Sons to defendant on previous indebtedness, and the balance in cash was applied in payment of the promissory note or notes given while the ship was being loaded. The defendant then in some instances sold said drafts, so accompanied by said shipping documents, to bankers in San Francisco, but generally remitted the same to his agent in London, who caused the same to be accepted by the drawees and said shipping documents delivered to them.

"Said E. E. Morgan's Sons kept in their books an open running account with said Daniel Meyer wherein they regularly credited him with all moneys received from him, and charged him with the several drafts as soon as delivered.

"This account shows that from July, when said arrangement with Meyer was made, until E. E. Morgan's Sons failed—on the nineteenth of October—said E. E. Morgan's Sons were continuously indebted to said Daniel Meyer."

It appears that settlements of account were had from time to time between Morgan's Sons and Meyer, and the balance carried forward in the account between them. On the first of July, 1874, the balance due by Morgan's Sons to Meyer was twenty-eight thousand one hundred and sixty-eight dollars and thirty-seven cents. The settlements referred to above seem to have been generally had twice a month, and the balances due Meyer varied on each settlement, and increased in amount generally until the balance due to defendant on the seventeenth of October, 1874, amounted to ninety thousand one hundred and eighteen dollars and nineteen cents. The bills of lading and invoices embraced all the wheat sued for and by the transactions above stated the Court finds the defendant received "the said wheat in pledge."

That during all the times above referred to, Morgan's Sons were heavily indebted over and above their assets, and were utterly insolvent, of which defendant was during the whole time aware: that the farmers above mentioned knew nothing of their indebtedness or insolvency, but on the contrary they had been informed by them that they were wealthy, and their agreement to ship through them was made with the understanding that the advances to be made by them under their

agreement, were to be made to them by Morgan's Sons from their own resources, all of which they believed to be true.

The advances made by Morgan's Sons to these farmers amounted to one thousand one hundred and fifty-one dollars and eighteen cents, which sum includes the inland freight and shipping charges paid by the latter. That all the transactions of Morgan's Sons with Meyer, were made without the knowledge or consent of the farmers. That Morgan's Sons were attached on the nineteenth of October, 1874, soon after the sailing of the ships mentioned, in an action brought against them by the London and San Francisco Bank, to recover a debt of more than three hundred thousand dollars, which had been contracted before the arrangement above stated was made by them with the farmers to forward their wheat for sale to Europe. Of this suit Meyer was all the time aware. He and Morgan's Sons also knew that this suit was to be instituted several days in advance of its being brought, and still continued their dealings as before in taking and receiving bills of lading and drawing drafts against the wheat until the suit was commenced on the day above mentioned; that during the whole period covered by these transactions, Meyer knew that Morgan's Sons were only factors and that they did not own the wheat shipped and dealt with as above stated, and that it was the property of the farmers above referred to. It further appears that the farmers did not know that their wheat had been dealt with as above detailed, or that it had not been handled as agreed on between them and each of them and Morgan's Sons, nor did they know of the transactions had by Morgan's Sons and defendant until all of the ships afore-mentioned had sailed from San Francisco, and the bills of lading with the accompanying drafts had been, by defendant Meyer, disposed of in San Francisco, or forwarded to his correspondent in Europe, to be presented to the drawees for acceptance. The wheat reached the hands of the parties in Europe, on whom the drafts were drawn, in due course, and was sold by them, the proceeds of sales collected and applied first to the reimbursement of themselves for the amounts of the drafts and the expenses attending the sales, and the balance was remitted by them

to the Grangers' Bank of San Francisco for account of the owners of the wheat.

The Court found that Meyer converted the wheat shipped to his own use, and rendered judgment against him.

It is argued by counsel for defendant, that he (Meyer) never had possession of the wheat, never had any manucaption of it, or handled it in any way; that there was no pledge of the wheat to Meyer, nor did he ever have any property in it; that he was merely employed by Morgan's Sons as a means of transporting the shipping documents to the drawees of the drafts, and, therefore, the Court in holding a conversion by Meyer, ruled contrary to law.

It is clear from the facts found by the Court, as above detailed, Meyer knowing that the wheat was not the wheat of Morgan's Sons, but belonged to the plaintiff and his assignors, aided in and assisted Morgan's Sons in shipping and forwarding the wheat in violation of the agreement under which they had received it. He enabled them by advances when, to his knowledge they were insolvent, to ship the wheat to Europe and to procure advances upon it to reimburse him, not only the advances made in shipping the wheat, but also to repay to him a debt due him by Morgans's Sons, contracted prior to the commencement of any dealings in regard to this wheat by Morgan's Sons with its owners. The transactions between Morgan's Sons and himself were entered on with the understanding that the drafts drawn against it by Meyer were to be used to pay to him the large advances made by him, far exceeding the inland freight and expenses of putting the wheat on shipboard, and they were so used. As the different lots of wheat were put on board, the mate of each vessel received and gave receipts for them, and the receipts were indorsed in blank and delivered to defendant as security for the advances made from time to time while the wheat was being shipped; and after each shipment was complete, a bill or bills of lading for each shipment were signed by the master and delivered to Meyer with the other shipping documents, along with drafts drawn against them, the shipping documents to be held as security for the acceptance of the drafts. All this was done under an agreement entered into by defendant

with Morgan's Sons before any wheat was forwarded to the latter.

At the close of the transaction which took place between them a large sum was due by them to him, exceeding ninety thousand dollars, and the drafts were taken, discounted by him (Meyer), and the proceeds used to pay off such indebtedness. The drafts and bills of lading were indorsed in blank by Morgan's Sons, and delivered to him under their agreement that they were to be used to secure him as above stated, and these drafts and bills of lading so indorsed, accompanied also with the other shipping documents, were by him forwarded to his correspondent in Europe to be used in procuring the acceptance of the drafts, and when the drafts were accepted to be delivered up to the acceptors. All these things were done by defendant when he not only knew that the property, concerning which he was dealing with Morgan's Sons, was not owned by them, but that they (Morgan's Son's) had received it to forward it to Europe for sale on account of the owners and not for the purpose of drawing against it or making it a, means of raising money by them to pay off any debts contracted and due by them. These acts were knowingly done, in violation of the contract on which Morgan's Sons had received the wheat.

It is well settled that a bill of lading represents the property for which it has been given, and by its indorsement or by delivery without indorsement the property in the goods may be transferred, when such is the intent with which the indorsement or delivery is made. It was so determined in *Lickbarrow* v. *Mason*, decided by the House of Lords in 1793. (See 1 Smith's Lead. Cas., 1058; see also *Merchants' Bank* v. *Union R. R. and Transportation Co.*, 69 N. Y., 376; *City Bank* v. *Rome, etc. R. Co.* 44 id., 136; *Holmes* v. *German Security Bank*, 87 P. St. 525: *Emery's Sons* v. *Irving National Bank*, 25 Ohio St., 366; Civil Code, §§ 2126, 2127, 2128, 2129, 2130, 2131, 2132.)

In the case last cited the law is thus stated: "By the rules of commercial law, bills of lading are regarded as symbols of the property therein described, and the delivery of such bill by one having an interest in or a right to control the property is equivalent to a delivery of the property itself. A consignor

who has reserved the *jus disponendi* may effectuate a sale or pledge of the property consigned by delivery of the *bill of sale* to the purchaser or pledgee, as completely as if the property were in fact delivered." (25 Ohio St. 366.) [The words "bill of sale" in the above sentence should, no doubt, be "bill of lading." The context plainly indicates this.]

In the case cited from 69 N. Y. it is said: "Bills of lading are choses in action, and no rule is better established than that instruments of this character may be transferred for a valuable consideration by delivery only." (69 N. Y. 379.)

In dealings between parties living at a distance from each other, when the contract is made by correspondence, it frequently becomes a matter of proper expediency to reserve the *jus disponendi* over goods shipped, especially when the shipper or a person making a draft drawn against the goods desires to secure himself against the insolvency or default of the consignee. These cases assume many shapes. Many of them are referred to and discussed by Mr. Benjamin in his work on Sales. (See Chapter vi., Book ii.)

The indorsee for value of a bill of lading which has been delivered to him may bring an action in his own name for the goods, though he can not generally bring an action on that instrument in his own name. (*Thompson* v. *Dominy*, 14 M. & W. 402; *Dows* v. *Cobb*, 12 Barb. 316; *Blanchard* v. *Page*, 8 Gray, 298.) And generally in all cases where the shipper having the right of property indorses and delivers the bill of lading, the indorsee may maintain an action for the goods represented by such bill of lading in his own name.

It thus appears to be established as a correct rule that a person purchasing a draft drawn by the shipper of the goods with a bill of lading accompanying it, has a special property in the goods covered by the bill of lading; usually in the case of a time draft this special property vests in the purchaser of the draft as security for its acceptance. It may be, if so agreed between the shipper and the purchaser of the draft, that the purchaser will have a right to retain the bill of lading, and thus retain his special property in the goods shipped, not only for the acceptance but for the payment of the draft. (*Bank of Rochester* v. *Jones*, 4 N. Y. 497; *Dows* v. *Greene*, 24

id. 638; *First National Bank of Cincinnati* v. *Kelly*, 57 id. 36; and cases there cited; *Lanfear* v. *Blossman*, 1 La. Ann. 153; *Dows* v. *National Exchange Bank*, 91 U. S. 618; *National Bank* v. *Merchants Bank*, id. 95; *National Bank of Chicago* v. *Bayley*, 115 Mass. 229; *Mason* v. *Hunt*, 1 Doug. 299.) All of these cases hold that the indorsee of the bill of lading who has purchased the draft, accompanied by such bill of lading, has a special property in the goods, and has the bill of lading and the shipment it represents for its security.

It is established by the findings that Meyer purchased the drafts of Morgan's Sons and paid for them, that he received the bills of lading and other shipping documents along with the drafts as security for their acceptance, and in the light of the cases above cited, we can come to no other conclusion than as to the transactions between him (Meyer) and Morgan's Sons, their legal effect was to transfer to Meyer a special property in the goods represented by the bills of lading.

The Court found that the transaction was a pledge of the wheat represented by the bills of lading, and in this we think it ruled correctly. In *Bank of Rochester* v. *Jones*, 4 N. Y. 503, the Court held such a transaction a pledge. This language is used by the Court in that case: "The transaction may also be regarded as a pledge. Delivery of possession, which is essential to a pledge, here accompanied the pledge. The carrier held the goods as the mere servant of Foster. [Foster was the shipper as Morgan's Sons are here.] And the delivery of the carrier's receipt to the bank was a good symbolical delivery of the flour. It was as effective in transferring the possession as the delivery of the keys of a warehouse or the receipt of a storekeeper." Justice Cowen in *Grosvenor* v. *Phillips*, 2 Hill, 147, says that a "conventional lien by way of pledge or mortgage may as well be raised in the hands of a carrier as a right by absolute sale. *Haille* v. *Smith*, 1 Bos. & Pul. 563, was no more."

We can perceive no difference between a carrier's receipt as far as relates to the question before us, and a bill of lading. The receipt of the carrier is really a bill of lading for goods to be transported by land. (*Dows* v. *Perrin*, 16 N. Y. 325; *Grace* v. *Adams*, 100 Mass. 505; *Blade* v. *Chicago, etc. R. R.*, 10 Wis. 54; *Dows* v. *Rush*, 28 Barb. 157.)

But it is said that Meyer received these shipping documents from Morgan's Sons merely for the purpose of transmitting them to the drawees of the drafts, and had no other interest in them than a mere intermediary by whom they were sent to the drawees; that he occupied the same position as a bank in New York to whom a draft payable in Boston had been sent from San Francisco for collection, which transmits it to a correspondent in the city of Boston for the purpose of accomplishing what the bank in New York had undertaken to do, namely, the collection of the draft. Such a contract might have been made by Morgan's Sons with Meyer, but it does not appear that any such contract was entered into. The findings of the Court negative any such arrangement, and we think such findings are fully sustained by the evidence. Nor do we perceive any reason for making any such arrangement. Morgan's Sons could have transmitted the drafts as well as Meyer. The usual mode of transmitting drafts by the mails was as open and accessible to them as to Meyer. The evidence shows strong reasons why Meyer should have taken them as security for the acceptance of the drafts. The drawers were insolvent, on the edge of bankruptcy, and Meyer in the exercise of the most ordinary prudence as a merchant or banker might well have desired security until the drafts had been honored by acceptance. He could not trust the drawers, and he had every reason to believe, as the evidence shows, that the drawees were of high and undoubted credit, whom he might trust without security and could with safety surrender to them the bills of lading. Moreover, such an arrangement was suggested and allowed by the letters of credit. It may be asked why, if he desired security, he did not have an agreement with Morgan's Sons that he might retain the bills of lading as security for the payment of the drafts as well as for acceptance. This has already been partly answered by what has been said of the known high credit of the drawees. A further reason may be given: the drafts would not then have gone forward on the terms of the credits, and the drawees would not have accepted them.

Whether the letters of credit afforded any security to Meyer for the acceptance of the drafts need not be considered. If they did, Meyer did not rely only on such security. If Meyer

had relied on such security, this could not prevent him for bargaining for the further security of the bills of lading, which the findings show was procured by him by contract with Morgan's Sons.

In the case before us the defendant assumed control of the property of the plaintiff and his assignors, and the right to dispose of it, by means of the bills of lading transferred to him under the arrangement with Morgan's Sons. He did this with a full knowledge of their right of property. He assisted Morgan's Sons in violating the terms of the bailment under which they had received the property of the parties above mentioned. Morgan's Sons had received the property to send it abroad to be sold without right to pledge or incumber it; this was known to the defendant, yet he aided and combined with them to incumber it by the drafts drawn against it under the letters of credit. By the transfer of the shipping documents control of the wheat was vested in Meyer. It was in his power to have transferred the property to a *bona fide* purchaser, and he did transfer it to the parties who issued the credits under circumstances which gave them a right to detain it for the payment of the drafts drawn against it and accepted by them. (Civil Code, Sec. 2369; *Green* v. *Campbell*, 52 Cal. 586; *Newhall* v. *C. P. R. R. Co.* 51 id. 350.)

In *Liptrot* v. *Holmes*, 1 Kelly (Ga.), 381, said Warner, J., delivering the opinion of the Court: "The action of trover being founded on a conjoint right of property and possession, any act of the defendant which negatives or is inconsistent with such right amounts in law to a conversion. It is not necessary to a conversion that there should be a manual taking of the thing in question by the defendant; it is not necessary that it should be shown that he has applied it to his own use. Does he exercise a dominion over it in exclusion or in defiance of the plaintiff's right? If he does, this is in law a conversion, be it for his own or another person's use." The learned Justice cites 6 Bacon's Abr. 677; *Bristol* v. *Burt*, 7 Johns. 258; S. C., 5 Am. Dec. 264; *Reid* v. *Colcock*, 1 Nott. & McC. 600; S. C., 9 Am. Dec. 729; *Reynolds* v. *Shuler*, 5 Cowen, 323.

In *Cobbs* v. *Dows*, 9 Barb. 242, the rule is thus stated: "The proof need not show a tortious taking, or that the defendants

acted in bad faith. If it should appear that they obtained the goods fairly from a person whom they had reason to think was the true owner, or if they acted under a mistake as to the plaintiffs' title, or under an honest but mistaken belief that the property was their own, they would still be liable to plaintiffs if their acts in regard to it amount to a conversion. If they have taken it into their own hands or disposed of it to others, or exercised any dominion over it whatever, they are guilty of a conversion, and their liability to plaintiffs is established." In *Boyce* v. *Brockway*, 31 N. Y. 493, the law as thus stated is approved, and is said to be fully sustained by the authorities, of which a number are cited. (See also *West Jersey R. R. Co.* v. *Trenton Car Works Co.*, 32 N. J. 517; *Webber* v. *Davis*, 44 Me. 152.)

It is contended that Meyer never had possession of the wheat, never handled it, and therefore did not convert it. Some of the cases just above cited expressly held that this is not necessary. To these we add *Connah* v. *Hale*, 23 Wend. 462, where it was held that to constitute a tortious taking it was not necessary that there should be an actual manucaption of the goods. A mere claim of dominion, an intention intimated to interfere with goods under a pretense of right or authority, amounts to a constructive trespass, and no demand is necessary before bringing an action of trover. (See *Schroeppel* v. *Corning*, 5 Denio, 240; *Covell* v. *Hill*, 2 Seld. 374.)

But it is evident here that Morgan's Sons received the wheat under a bailment which they violated—intended to violate it before they received it. They had made arrangements for that purpose with Meyer before the wheat came to hand. Such an arrangement violative of this contract of bailment with the plaintiff and his assignors was made between Morgan's Sons and Meyer, with full knowledge on the part of Meyer that the arrangement was of that character. The inference is justified by the facts found that there was between these parties a combination or conspiracy to carry out this arrangement in exclusion of the rights of the farmers with whom they were dealing. The act of one conspirator in furtherance of the common purpose is the act of all. When Morgan's Sons took the wheat with the agreement with Meyer to ship it in violation of this agreement, and commenced load-

ing it on the ships in pursuance thereof, they were guilty of a conversion of the property intrusted to them, and Meyer's relation to them of confederate, aiding and abetting them in their wrongful conduct, made him a co-trespasser with Morgan's Sons, and he could also be charged with the conversion. It is a significant circumstance which sustains this view that Meyer, under the arrangement, advanced the money to pay the inland freight—the freight on the wheat to San Francisco—by which Morgan's Sons obtained possession of the wheat. Granted that Morgan's Sons were removing the wheat with such purpose under the arrangement made with Meyer, and that Meyer was conspiring with and aiding them to do it, the plaintiff might then have maintained an action for the conversion of the wheat, even while it was on the wharf and before it was delivered on shipboard. The transactions subsequently had in accordance with this arrangement established beyond doubt that the entire dealing with the wheat was with intent to use it for their own benefit in violation of and in hostility to the rights of the farmers who had intrusted their wheat to Morgan's Sons.

It is too clear to admit of argument that as soon as the contract of bailment was violated by Morgan's Sons they became trespassers, and their constituents were entitled to take the wheat out of their hands. It was not necessary to wait until their plan was so far carried out as to get the wheat on shipboard. The first acts in violation of their contract gave this right to their principals, the farmers, and they were then entitled to recover possession of their property.

It may be further said that whatever possession or right to the possession Meyer had was derived from the plaintiff and his assignors through the fraudulent and unauthorized conduct of Morgan's Sons, in which he was a participant. It would be strange, conceding that neither the plaintiff nor his assignors could recover against the master of the ship on which the wheat was laden under the contract of affreightment, after it was so laden, that Meyer could set up the title of the master to defeat a recovery by the plaintiff or those of whom he is the assignee. Having received the wheat under a contract to deal with it for one purpose, and using it, or, rather misusing it for another, ought Morgan's Sons to be permitted to

take advantage of their own wrong and set up a delivery of the wheat to a master under a contract of affreightment, which was in part execution of the unauthorized scheme to wrong their constituents? The statement of the proposition is an answer to it. Meyer's rights to the possession are no higher than Morgan's Sons, his assignors. If Morgan's Sons, employed as mere custodians, but clothed with the indicia of property, so as to appear to be the ostensible owners, had sold to a *bona fide* purchaser, it might be argued that a recovery could not be had against Morgan's Sons, because the plaintiff was not entitled to the possession against the *bona fide* purchaser; but surely such position would not be tenable.

Further, a bailee can not, in an action brought against him by his bailor, set up the title of a third person, except by the authorization of that person. The question is discussed and many of the cases cited in *Palmtag* v. *Doutrick,* 8 P. C. L. J. 884. (See *The Idaho,* 93 U. S. 579.) In *Biddle* v. *Bond,* 6 Best & S. 225, it is held following *Thorne* v. *Tilbury,* 3 H. & N. 534, that a bailee can set up the title of another only "if he depends upon the right and title and by the authority of that person." (6 B. & S. 234.) We find no authorization of the shipmaster here to defend on his title, and therefore it can not be used by Meyer for his protection.

A question is made on the phraseology of the twenty-fifth finding "that all of said cargoes of wheat were consigned by E. E. Morgan's Sons to said Rathbone Bros. & Co., and Brown, Jansen & Co., and in due course reached their hands," etc., as inconsistent with the conclusion that Meyer could control the wheat as indorsee of the drafts and shipping documents. We are unable to perceive any such inconsistency. Surely this language can not mean more than that Morgan's Sons, so far as they were able to control the wheat consigned it to the parties named, and that the wheat reached these parties in due course, that is, in the course indicated by the previous findings, by accepting the drafts, and on such acceptance, receiving the bills of lading from Meyer by which they (Rathbone Bros. & Co., and Brown, Jansen & Co.), were enabled to and did secure the possession of the wheat.

We have examined the errors assigned in regard to the rul-

ings of the Court in relation to the testimony, and find no error in them.

Some of the findings were assailed as not sustained by the evidence. We are of opinion, as plainly indicated above, that they were sustained. Some conclusions of law were inserted in the findings of fact, in regard to the dealings found as to the mate's receipts and the bills of lading. The Court held that the transactions in regard to them amounted to a pledge. In this we think the Court ruled correctly.

There is no error appearing in the record, and the judgment and order are affirmed as of July 1, 1882.

MORRISON, C. J., and SHARPSTEIN, ROSS, and MYRICK, JJ., concurred.

McKINSTRY, J., concurred and cited *Green* v. *Meyer*, No 4879, March 14, 1878.

McKEE, J., dissenting:

I dissent. In 1874, the firm of E. E. Morgan's Sons were commission merchants and factors in San Francisco, engaged in chartering ships, which they controlled for themselves, for the purpose of shipping wheat from California to foreign countries, for sale. With these factors, a number of wheatgrowers in this State entered into agreements for forwarding their wheat to them, to be shipped by them to Europe and sold for the account of the owners. By the terms of the agreements Morgan's Sons were to take charge of the wheat, make advances on it to the farmers to an extent not exceeding twenty dollars per ton, inclusive of all necessary advances for shipment and transportation, ship it to Europe and sell it in European markets, and when sold account to the respective owners for the proceeds of sales, less their allowances, rates, commissions and other expenses.

Under this agreement between Morgan's Sons and the farmers, the former received from the latter, at the port of Vallejo, in this State, during the months of September and October, 1874, a large quantity of wheat including the plaintiff's wheat, which they shipped from Vallejo, on board ships chartered by them for that purpose, consigned to Rathbone Brothers & Co. and Brown, Jansen & Co., to be sold in the.

Liverpool market for and on account of the owners of the wheat.

The ships arrived safely at Liverpool; and the cargoes of wheat were delivered, in good order by the masters of the ships, to the consignees by whom the wheat was sold in Liverpool, and they received the proceeds of the sales. But neither they nor Morgan's Sons returned all the proceeds—less the allowances, rates, compensations, and other expenses according to the agreement between them and the farmers. On the contrary, the consignees in Liverpool applied the proceeds of the sales of the wheat to the satisfaction of certain bills of exchange, which had been drawn by Morgan's Sons against the cargoes, and were accepted by the consignees, and the balance, after payment of the expenses attending the sales, they remitted to the Grangers' Bank of San Francisco for account of the owners of the wheat.

But as the owners failed to receive the proceeds of the sales of their wheat, they, by their actions, seek to make the defendant liable for the value of the wheat, because of his connection with the transactions between him and Morgan's Sons, whereby he purchased the bills of exchange, drawn against the wheat, which bills were accepted and paid by the drawees.

The bills of exchange were drawn under the following circumstances: After Morgan's Sons had contracted with the farmers to take charge of their wheat for shipment, transportation and sale, they, for the purpose of enabling them to charter vessels and carry out their engagements, made an arrangement with Rathbone Brothers & Co., of Liverpool, and Brown, Jansen & Co., of London, to consign the shipments of wheat to them for sale, if they would make advances upon the shipments. For that purpose Rathbone Brothers & Co., and Brown, Jansen & Co., agreed to make advances to them to the extent of one hundred thousand pounds, sterling, according to the terms of two special letters of credit, which were as follows:

" LIVERPOOL, 30th June, 1874.

"*Messrs. E. E. Morgan's Sons, San Francisco, Cal.*

" DEAR SIRS: We hereby authorize your draft upon us at sixty days' sight [60 days' sight], payable in London, against

shipping documents—namely, invoice bills of lading and policy of insurance for wheat shipped at California or Oregon—at the rate of forty-two shillings and six-pence (42s 6d) for California wheat, and forty-five shillings (45s) for Oregon wheat, each of fair average quality, and each per quarter of five hundred pounds, cost, freight and insurance; the insurance to be effected with approved offices, and the documents to be surrendered to us against our acceptances. This credit is limited to the amount of one hundred thousand pounds sterling (£100,000), which will be renewed by advice from us of the arrival and sale of cargoes.

" We hereby agree that all bills drawn by virtue of this credit shall be duly honored when presented at our office at Liverpool, if drawn and negotiated before the thirtieth of June, 1875.

" You will please add to all drafts under this credit, and charge to E. E. M.'s S., as per your L. C., dated June 30, 1874.

" We remain, dear sirs, yours faithfully,

[Signed]                         " RATHBONE BROS. & Co."

At the time of the transactions, Morgan's Sons were known to themselves and the public to be insolvent; but, being armed with these letters of credit, the defendant, on the faith of the letters, agreed to purchase the bills of exchange to be drawn according to the terms of the letters; and for that purpose to make advances of money to the insolvent factors, from time to time as their needs might require it, in handling the wheat, which they had contracted to ship and to sell for their principals. Accordingly he did, during the months of August, September and October, 1874, advance various sums of money, for which they gave, at the time of the advances, their promissory notes and deposited with him the mate's receipts of the wheat as it was received from day to day on board the vessels. When each ship was laden, these receipts were returned to the master of the ship, and he, then, issued a bill of lading for the ship's cargo to the order of Morgan's Sons. An invoice was also made of the wheat, and policies of insurance were procured upon the cargo represented by the bill of lading; and with these in hand, Morgan's Sons had an accounting with the defendant of the ad-

vances which had been made to them in the shipment of the wheat; and for the sums which had been advanced, bills of exchange were drawn on the European correspondence, according to the letters of credit, payable, on sixty days' sight, to the order of Morgan's Sons; these bills of exchange were then attached to the invoices, policies of insurance and bills of lading, and all of them, being respectively indorsed in blank, were delivered to the defendant, who then returned the promissory notes to their makers. Some of the bills of exchange the defendant sold to bankers in San Francisco; but all of them were transmitted in connection with the invoices, policies of insurance and bills of lading, by him to his agent in London to be presented to the drawees for acceptance.

It is solely from this transaction between the defendant and Morgan's Sons, that the Court below found that the defendant became a pledgee of the wheat, and that, on refusal to deliver it to the owners, on demand, he was guilty of a conversion; and it is sought to be established as a principle of commercial law, the purchaser of a bill of exchange drawn against a shipment of wheat by the consignor, upon a letter of credit given to him by the drawee, becomes a pledgee of the wheat, by the receipt of a bill of lading which has been received, in connection with the bill of exchange, to be transmitted, with the exchange, to the drawee against his acceptance according to the terms of his letters of credit, and that, as holder of the bill of lading for that purpose, he is guilty of a conversion of the wheat, in refusing to deliver it on demand, although, in fact, he never received the wheat, never claimed or exercised the right to receive it, and never exercised any dominion or control over it. To such a principle I cannot consent. In my judgment the transaction, as proved, does not sustain the findings of the Court below, and the decision of the Court is erroneous, and should be reversed.

"A bill of lading," as has been said by the Supreme Court of the United States, "is an instrument well known in commercial transactions, and its character and effect have been defined by judicial decisions. In the hands of the holder it is evidence of ownership, special or general, of the property mentioned in it, and of the *right to receive the property at*

*the place of .delivery.* Notwithstanding it is designed to pass from hand to hand with or without indorsement, and is efficacious for its ordinary purposes in the hands of the holder, it is not a negotiable instrument or obligation in the sense that a bill of exchange or promissory note is. Its transfer does not preclude, as in those cases, all inquiry into the transaction in which it originated," or the purpose for which it may be indorsed or delivered. So where it was made to appear that an indorsed bill of lading was received by one who was the mere agent of the shipper, it was held that the property represented by the bill did not pass to the holder. (*Lincker* v. *Ayeshford,* 1 Cal. 75.)

Neither the indorsement nor the delivery of the bill has any effect in passing the property represented by it, except as the result of a contract between the parties for the sale or transfer of the property itself; and such a contract, whatever it be, may be shown by parol, or by circumstances to explain, limit, or extend the operation of the indorsement and delivery. (*Gardner* v. *Howland,* 2 Pick. 599.) I therefore agree to the principle enunciated in the prevailing opinion, that a bill of lading represents the property for which it was given, and that the right to the property passes by indorsement and delivery of the bill, *when such was the intent with which the indorsement was made;* but that *is* the pivotal question in the case. The defendant received the bills of lading, but for what purpose? Was it for the purpose of receiving the wheat at the port of delivery, or for transmission, as agent of the drawer or drawees, to the drawees of the bills of exchange, who had stipulated by their letters of credit for the surrender of the bills of lading against their acceptance of the bills of exchange?

On that question, the transaction, as found by the Court, leaves no room for legal doubt. It is conceded that, so far as the shipment of the wheat was concerned, eveything done up to the putting it on board and the reception of the bills of lading for it, was authorized. It is also conceded that the bills of lading were properly issued, according to law, to the orders of Morgan's Sons. Now, the indorsements of the bills were not made in pursuance of any contract between them and the defendant to pledge the wheat. They had no autho-

rity, in fact or in law, to pledge it; none in fact, for they were not authorized to pledge by their principals; none in law, for the law did not allow it; did, in fact, prohibit it (Sec. 2358, C. C.); nor does the transaction evidence an attempt to pledge; for, being clothed with actual and legal authority to ship and sell (Sec. 2388, *supra*), the consignors delivered the wheat into the possession of the master of the ship, who, as their bailee, received it and delivered it to the consignees, by whom it was, in fact received and sold, under the authority of the owners for their account; so that from the time of the shipment of the wheat until its sale by the consignees, the wheat was in possession of the owners. It never at any time came into the possession of the defendant as pledgee or otherwise.

No pledge is valid until the property is delivered to the pledgee (C. C., § 2988), or is deposited in pursuance of an agreement between the parties with a third person to hold for the pledgee. (§ 2903, *supra*.) The captains of the ships were not the pledge-holders for the defendant. During the voyages they were the agents of the owners of the cargoes; and the safe arrival of their ships at port, and the delivery of their cargoes to the consignees, exonerated them and the owners of their ships from all liability to any one on account of the cargoes. As, therefore, the wheat was never delivered to the defendant, was never deposited with a third person to hold for him—as he never claimed or exercised the right to receive it, and never interfered with the dominion and control of it, nor with the *jus disponendi* of the plaintiffs, exercised through their authorized agents, I can not judicially see in the transaction between the defendant and Morgan's Sons any of the elements of the pledge. Nor does the transaction make the defendant a *tort feasor*. As I have already said, the defendant did not obtain possession of the wheat, did not assume to exercise any ownership or control over it, did not *use* the bills of lading or take or claim the property, or to interfere with it in any way, in the possession of the plaintiff or of his consignees. Where one does no act of disturbance of the possession of the property of another or of interference with it, or of assumption of dominion and control over it under pretense of a right, he is not guilty of a trespass or conversion of the property, although

he may be holder of a bill of sale which represents it; the law does not educe a taking and conversion of property out of non-action; there must be a wrongful act or omission and a consequent invasion of another's right to constitute a *tort.*

The defendant did receive the bills of lading attached to the bills of exchange which he had purchased, did transmit them to his agent at London, did through his agent, surrender them to the drawees of the bills of exchange against their acceptance. These were not wrongful acts nor an invasion of the plaintiff's rights of property in the wheat in the hands of his authorized agents. The reception, transmission and surrender of the bills were made by him, as agent of the drawees of the bills of exchange, according to the terms of the letters of credit. The letters prescribed the mode in which the credit was to be given, the terms on which it was to be given, and the limits of the credit; the mode was the measure of the credit; and the drawees of the bills would not have been bound for their acceptances except by strict compliance with the terms of the letters. (C. C., § 2866.) The liability of the correspondents could not have been enforced by the defendant, except in the mode which he pursued.

Defendant followed the mode prescribed, surrendered the bills of lading, and his bills of exchange were accepted; he had, therefore, no occasion to take or interfere with the wheat, which was all the time in the possession of the plaintiff; and it is manifest from the findings of facts by the Court, that he did not take nor intermeddle with it, or claim, or assume to exercise dominion or control over it.

The case of *Green* v. *Meyer,* which forms the basis of Justice McKinstry's concurrence with the prevailing opinion, is one of those imperviable decisions which is not satisfactorily authoritative—the reason for it being still in the breasts of the Judges by whom it was rendered. —